**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION**

| | | |
|---|---|---|
| **STEPHEN R. CRIBBS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION FILE** |
| | ) | **NO.: 4:2011-cv-00263** |
| | ) | |
| **NFI INDUSTRIES, INC.,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT NFI NETWORK LOGISTIC
SOLUTIONS LLC'S RENEWED STATEMENT OF UNCONTESTED
FACTS AND CONCLUSIONS OF LAW THEREOF**

COMES NOW, Plaintiff Stephen R. Cribbs ("Plaintiff"), and pursuant to

Federal Rule of Civil Procedure 56 and Local Rules 7.1 and 56.1, files this

Plaintiff's Response to NFI Network Logistic Solutions, LLC's Renewed

Statement of Uncontested Facts and Conclusions of Law Thereof, showing the

Court as follows:

1

# I. CONTESTED MATERIAL FACTS[1]

1.     NFI is a Georgia LLC which operates two warehousing and logistics facilities in Rincon, Georgia known as the "DC" and the "Mill" (the "Rincon facilities").

**RESPONSE:** Admitted.

2.     NFI purchased and started operating the Rincon business on August 3, 2009.

**RESPONSE:** Admitted.

3.     The DC and the Mill facilities are located just down the street from each other and are basically mirrored operations.

**RESPONSE:** Denied.  "The paperwork was different. The loads were different. The buildings were different. A lot of [the Mill is] run by robots.  Different safety issues at the mill, different confines of the mill. Everything was different than what we did on our side of the road." (Plaintiff depo., pp. 60:20-25 -61:1-3.)  The

---

[1] The disputed facts are derived from the depositions of Nathaniel Griffin (Exhibit AA - "Griffin depo."), Ruth Rector (Exhibit BB - "Rector depo."), David Starling (Exhibit CC - "Starling depo."), Reggie Pero (Exhibit DD - "Pero depo."), Jerry McKenzie (Exhibit EE - "McKenzie depo."), Plaintiff (Exhibit FF - "Plaintiff depo."), Rhonda Butler (Exhibit GG - "Butler depo."), and Pat Byrnes (Exhibit HH - "Byrnes depo.").  Disputed fact are also derived from the NFI Supervisor Position Description (Exhibit II); the Revised Declarations of Debra Cribbs (Exhibit JJ), Jeremy Walker (Exhibit KK), and Plaintiff (Exhibit MM), in addition to the Declaration of Reginald Pero (Exhibit LL).  Further disputed facts are derived from the February 11, 2010 e-mail from Rhonda Butler (Exhibit NN - "Butler e-mail"); the March 3, 2010 doctor's note (Exhibit OO - "Doctor's Note"); and the May 15, 2012 COBRA notice (Exhibit PP - "COBRA notice"). Further factual support, for Plaintiff's claims, including citations to the record, is set forth in Plaintiff's Response brief.

weekend night shift at the Mill facility was especially undesirable. (Butler depo., pp. 8:15-9:10.)

4.      The sole function of the Rincon facilities is to provide warehousing and logistics for its only customer, Georgia Pacific ("GP").

**RESPONSE:** Admitted, but irrelevant.

5.      NFI is responsible for warehousing, moving and loading GP product into tractor trailers at the Rincon facilities, both of which operate 24 hours a day, 7 days a week, in order to provide constant warehousing and logistics support to GP.

**RESPONSE:** Admitted, but irrelevant.

6.      Efficiency, safety, and GP satisfaction are essential to the NFI business in Rincon, GA. It is very important for NFI's relationship with GP to meet the established "load-by" times.

**RESPONSE:** Admitted, but irrelevant. Plaintiff made efficiency, safety and GP satisfaction a priority. (Revised Declaration of Stephen R. Cribbs (hereinafter "Plaintiff Decl."), ¶ 3; Griffin depo., p. 15:10-23; Rector depo., p. 16:12-18; Starling depo., p. 21:20-22; Pero depo., p. 15:6-15; *see also* Exhibit NN- Butler e-mail.)

7.      NFI has a one year contract with GP that is renewed on an annual basis, and GP reviews NFI's safety record every contract year.

**RESPONSE:** Admitted, but irrelevant. Plaintiff made safety a priority. (Plaintiff Decl., ¶ 3; Griffin depo., p. 15:10-23; Rector depo., p. 16:12-18; Starling depo., p. 21:20-22; Pero depo., p. 15:6-15; *see also* Exhibit NN - Butler e-mail.)

8.      If GP cancelled the contract for the Rincon facilities, that would do away with 40 or 50 percent of NFI's business.

**RESPONSE:** Admitted, but irrelevant.

9.      Safety at NFI is paramount because the warehouse environment is potentially very dangerous, and there was a work-related fatality on Plaintiff's shift at the DC prior to 2010.

**RESPONSE:** Admitted, but irrelevant. Plaintiff was not implicated in any way in the death of the employee, and Plaintiff made safety a priority. (Plaintiff Decl., ¶ 3; Griffin depo., p. 15:10-23; Rector depo., p. 16:12-18; Starling depo., p. 21:20-22; Pero depo., p. 15:6-15; *see also* Exhibit NN - Bulter e-mail.)

10.      Safety is even more important on the night shift and supervisory presence is essential to ensure that safety rules are being followed.

**RESPONSE:** Denied, but irrelevant.  Plaintiff made safety a priority and safety is no more important on the night shift than on any other shift.[2]  (Plaintiff Decl., ¶ 3;

---

[2] The absurd suggestion by Defendant that safety is more important on any particular shift demonstrates a substantial credibility issue.  Defendant will apparently profess any allegation in pursuit of its motion.

Griffin depo., p. 15:10-23; Rector depo., p. 16:12-18; Starling depo., p. 21:20-22; Pero depo., p. 15:6-15; *see also* Exhibit NN - Butler e-mail.)

11.    Since the NFI Rincon facilities operate on a 24 hour basis, it is a common practice that the managers, general manager, and Human Resources Manager ("HR Manager") are available by telephone to their Shift Supervisors for work-related issues, even during the night shifts.

**RESPONSE:** Admitted, but irrelevant.

12.    NFI encourages its managers and general managers as part of their job to come in on all shifts, evening the off shifts, to check and make sure everything is running fine.

**RESPONSE:** Admitted, but irrelevant.

13.    GP implemented a sophisticated Labor Management System ("LMS") at the DC facility which creates work standards for employees to achieve to improve productivity which involved negotiating a rebate to GP to pay them back for a cost savings NFI was supposed to realize as a result of the increased efficiencies.

**RESPONSE:** Admitted, but irrelevant.

14.    LMS accuracy is very important because it is directly tied to GP's customer satisfaction and how much profit NFI makes, and because LMS results were part of Shift Supervisor and management bonuses.

**RESPONSE:** Admitted, but irrelevant. Plaintiff received an annual bonus and pay increase each year he worked for NFI and he never missed a bonus or annual pay increase the entire time he worked for the company. (Plaintiff Decl., ¶ 4).

15.    All employees at NFI, including Plaintiff, have an at-will status with NFI and the employment relationship can be terminated at any time for any reason.

**RESPONSE:** Admitted, but irrelevant.

16.    The management style within NFI is to document employment matters carefully and NFI provides forms for use for employee warnings and disciplinary actions.

**RESPONSE:** Denied. NFI did not document Plaintiff's discrimination complaints. (Byrnes depo., p. 21:16-18.) Moreover, Mr. Byrnes instructed Reggie Pero, Plaintiff's direct report, to find ways to "write up" Plaintiff, which he did. (Pero depo., p. 24:12-15.) Mr. Pero could have written up other shift supervisors and managers for the same "violations" as Plaintiff, but did not "[b]ecause I was told specifically by Patrick Byrnes to make a concentrated effort to write up Randell [Plaintiff] at every cost to get him out of there" and to "make sure I am detailed in my documentation." (*Id.*, p. 24:7-15.) Mr. Byrnes did not ask Mr. Pero to be extremely thorough and detailed in documentation of any other individual. (*Id.*, p. 27:11-14.)

17.     The NFI Code of Conduct provides, in part:  "Disciplinary action may include a verbal warning, written warning, suspension and discharge. The appropriate disciplinary action imposed will be determined by NFI Industries. NFI Industries does not guarantee that one form of action will necessarily precede another."

**RESPONSE:** Admitted, but irrelevant.  NFI did not follow its Code of Conduct with regard to disciplinary action taken against Plaintiff. (Pero depo., pp. 24:7-15, 27:11-14.)

18.     The NFI Code of Conduct requires, among other things, that employees act in an ethical, honest, professional and courteous fashion, and perform their job functions in an efficient and professional manner.

**RESPONSE:** Admitted, but irrelevant. NFI did not follow its Code of Conduct with regard to disciplinary action taken against Plaintiff. (Pero depo., pp. 24:7-15, 27:11-14.) NFI did not follow its Code of Conduct in Byrne's instruction to Pero to find ways to "write up" Plaintiff (Pero depo., p. 24:12-15) unlike other shift supervisors and managers for the same "violations" as Plaintiff, and in the "concentrated effort to write up Randell [Plaintiff] at every cost to get him out of there" and to "make sure I am detailed in my documentation." (*Id.*, p. 24:7-15.) Plaintiff acted in an ethical, honest, professional and courteous fashion, and performed his job functions in an efficient and professional manner.  (Plaintiff

decl. ¶¶ 3, 4; Byrnes depo., pp. 76:23-25 – 77:1-3.; Griffin depo., p. 15:10-23; Rector depo., p. 16:12-18; Starling depo., p. 21:20-22; Pero depo., p. 15:6-15.)

19.    The NFI Code of Conduct prohibits, among other things:  violation  of policies or safety rules, insubordination, poor performance, dishonest, disrespect toward fellow employees, falsification of documents, and misleading any supervisor.

**RESPONSE:** Admitted, but irrelevant.  NFI did not follow its Code of Conduct with regard to disciplinary action taken against Plaintiff. (Pero depo., pp. 24:7-15, 27:11-14.) And Plaintiff acted in an ethical, honest, professional and courteous fashion, and performed his job functions in an efficient and professional manner, and never missed an annual raise or quarterly bonus.  (Plaintiff decl. ¶¶ 3, 4; Byrnes depo., pp. 76:23-25 – 77:1-3.; Griffin depo., p. 15:10-23; Rector depo., p. 16:12-18; Starling depo., p. 21:20-22; Pero depo., p. 15:6-15.)  By way of further response, Plaintiff incorporates by reference his responses in paragraphs 17 and 18, above, as if fully restated here.

20.    Plaintiff's birthdate is 10/27/58 and, at the time of his deposition in July of 2012, he was 54 years of age.

**RESPONSE:** Admitted.

21.    Plaintiff worked for NFI at the Rincon facilities since NFI purchased the business in August of 2009 through October 22, 2010.   Before NFI purchased the

business, Plaintiff had worked for the previous owner at the DC facility starting on March 9, 2000.

**RESPONSE:** Admitted.

22.     During 2009 and 2010, Plaintiff served in the position of Shift Supervisor over the night shift at the DC reporting to the General Manager who, in turn, reported to the Regional Vice President, Patrick Byrnes ("Mr. Byrnes").

**RESPONSE:** Admitted.

23.     A Shift Supervisor's job duties include supervising all employees on the shift including a lead and an allocator, as well as another 20-30 employees on the shift, and managing receiving and shipping product from GP on a tight schedule.

**RESPONSE:** Denied insofar as this list of duties is not exhaustive. (See Exhibit II – NFI Operations/Warehouse Supervisor Job Description.)

24.     Part of a Shift Supervisor's job is to assign to the associates the jobs compiled by the allocator who worked on that particular shift.

**RESPONSE:** Admitted.

25.     The Shift Supervisor position only requires, on average, approximately two to three hours or less of paperwork per shift.

**RESPONSE:**  Denied.  At the time Plaintiff worked for NFI, the position required more than three hours of paperwork per shift.  It would take even longer when certain unexpected events arose.  (Plaintiff Decl., ¶ 6).

26.    It is NFI's policy that, Shift Supervisors are supposed to stay at the NFI

facility to which they are assigned to oversee the work being performed on their

shift, with the exception of an authorized lunch break or a work-related trip to the

store; in the event that a Shift Supervisor leaves the facility for any other reason,

the Shift Supervisor should notify his or her manager.

**RESPONSE:** Denied.  Shift supervisors routinely left the facility for personal and

other reasons without being disciplined.  (Pero depo., pp. 24:7-15, 27:11-14; Butler

depo., p. 29:16-21; Plaintiff Decl., ¶ 7.)

27.    Shift Supervisors are instructed to be out on the warehouse "floor" for the

majority of their shift where their associates are moving product and loading

containers so that they can keep an eye on what is going on.

**RESPONSE:** Denied.  Shift supervisors routinely left the floor for personal and

other reasons without being disciplined.  (Pero depo., pp. 24:7-15, 27:11-14; Butler

depo., p. 29:16-21; Plaintiff Decl. ¶ 7.)

28.    NFI terminated Plaintiff's employment on October 22, 2010 after a series of

problems on his shift and customer complaints in 2010 which resulted in multiple

progressive disciplinary actions.

**RESPONSE:** Denied.  NFI terminated Plaintiff's employment on October 22,

2010 after Plaintiff, four days earlier on October 18, 2010, requested leave due to a

disability, advised Human Resources of receiving unfair treatment by management,

and requested that he be returned to his former shift at the DC. (Byrnes depo., pp. 21:9-18, 23:19-23; Plaintiff Decl., ¶ 17.)

29. At the time of his termination from employment from NFI, Plaintiff was earning a weekly average wage of $1,046.60 (translates into $54,423.20 per year or $26 per hour).

**RESPONSE:** Admitted

30. In 2009 and early 2010, the NFI HR Manager Deborah Gould (F/K/A Deborah Silva) ("Ms. Gould") received complaints from associates that Plaintiff was often in his office claiming that he had paperwork to do; Plaintiff was rarely seen out on the floor supervising his shift; Plaintiff delegated his supervisory paperwork to the lead on his shift, Jeremy Walker; Plaintiff allowed Jeremy Walker to pick out the easiest jobs from the allocator and then dole out the remainder of the jobs to the associates; Plaintiff afforded Jeremy Walker a great deal of power and basically allowed him to run the shift; and Plaintiff frequently left the DC facility several times per night during his shift to go to the nearby Wal-Mart and remained away for as much as an hour at a time. (Exhibit I (to Defendant's Motion) - Gould Aff., ¶¶ 6, 23, 25, 27, 28, 30.)

**RESPONSE:** Denied. As this Court found in its September 25, 2013 Order, there is no evidentiary support for this alleged statement of fact. (Doc. 55.) Ms. Gould was Human Resources Manager, and was never present on the floor of the Mill

when Mr. Cribbs was working and, thus, did not witness the described incident.

(Plaintiff Dec., ¶ 3.)  Ms. Gould's information about this incident is based entirely

on what others told her.  In any event, Plaintiff made safety a priority. (Plaintiff

Decl., ¶ 3; Griffin depo., p. 15:10-23; Rector depo., p. 16:12-18; Starling depo., p.

21:20-22; Pero depo., p. 15:6-15; *see also* Exhibit NN - Butler e-mail.)  Moreover,

Jeremy Walker was written up for this accident and sent for a drug test in

accordance with the NFI Code of Conduct. (Plaintiff Decl., ¶ 5).

31.   While working at the DC facility, it was not uncommon for Plaintiff to waste

time with co-workers and subordinates talking about non-work-related matters

during his shift.

**RESPONSE:** Denied.  Neither Gould nor Rector (upon whose testimony this

statement is predicated) witnessed the events alleged in this statement.  In any

event, Plaintiff acted in an ethical, honest, professional and courteous fashion, and

performed his job functions in an efficient and professional manner.  (Plaintiff

Decl. ¶¶ 3, 4; Byrnes Byrnes depo., pp. 76:23-25 – 77:1-3.; Griffin depo., p. 15:10-

23; Rector depo., p. 16:12-18; Starling depo., p. 21:20-22; Pero depo., p. 15:6-15.)

Ms. Gould was Human Resources Manager and was never present on the

floor of the Mill when Mr. Cribbs was working.  (Plaintiff Decl., ¶ 3.)  Moreover,

Gould's affidavit belies this statement. Gould admitted that Mr. Cribbs visited her

office on work-related matters.  (Exhibit I (to Defendant's Motion) - Gould aff., ¶

19.)  During these occasions, Gould often would engage Mr. Cribbs in personal conversation unrelated to work, such as asking him about his family or health. (Plaintiff Dec., ¶ 6.)  So, contrary to this "statement of fact," Mr. Cribbs' answering the direct questions of the Human Resources director, and discussing work-related matters, was not a waste of time.  (*Id*.)[3]  Human Resources Manager Debra Gould sometimes visited Mr. Cribbs' office on the DC side (but not in the warehouse) during Mr. Cribbs' shift to discuss work-related issues, and often during these conversations she would inquire about his health or *her* family matters.  (*Id*.)

Furthermore, the portions of the Rector deposition transcript that NFI cites as support for this statement are hearsay and, therefore, are not "facts" for purposes of a motion for summary judgment.  (Rector depo., p. 24:15-25.)

In any event, Plaintiff received regular raises and quarterly bonuses through 2010, performed his work well, and received no write-ups for wasting time or safety violations prior to 2010.  (Plaintiff Dec., ¶¶ 3, 4; Byrnes depo., pp. 76:23-25 – 77:1-3; Griffin depo., p. 15:10-23; Rector depo., p. 16:12-18; Starling depo., p. 21:20-22; Pero depo., p. 15:6-15.)  In 2010, Mr. Byrnes instructed Reggie Pero, Plaintiff's direct report, to find ways to "write up" Plaintiff, which he did.  (Pero

---

[3] Ironically, NFI has not shown that Plaintiff was ever written up for wasting time. NFI is apparently slinging mud hoping to influence the Court based on something other than the *relevant* facts.

depo., p. 24:12-15.)  Mr. Pero could have written up other shift supervisors and managers for the same "violations" as Plaintiff, but did not because "he did not deserve these write-ups for performance or any other reasons," (Declaration of Reggie Pero ("Pero Decl."), ¶ 6), and "[b]ecause I was told specifically by Patrick Byrnes to make a concentrated effort to write up Randell [Plaintiff] at every cost to get him out of there" and to "make sure I am detailed in my documentation." (Pero depo., p. 24:7-15.)  Mr. Byrnes did not ask Mr. Pero to be extremely thorough and detailed in documentation of any other individual.  (*Id.*, p. 27:11-14.)

32.   Plaintiff received a coaching session on January 19, 2010 relating to a complaint that he sent to GP's customer care about a transship that NFI received with lots of damage and improper slip sheet placement, when the transship was actually sent from  another  NFI  facility.

**RESPONSE:** Admitted, but irrelevant. Plaintiff still got regular raises and bonuses, acted in an ethical, honest, professional and courteous fashion, and performed his job functions in an efficient and professional manner.  (Plaintiff Decl.*,* ¶¶ 3, 4; Byrnes depo., pp. 76:23-25 – 77:1-3.; Griffin depo., p. 15:10-23; Rector depo., p. 16:12-18; Starling depo., p. 21:20-22; Pero depo., p. 15:6-15.)

33.   In  the  first  quarter  of  2010,  GP  expressed  its  concerns   to  NFI management that LMS goals were not being met at NFI, and put pressure on NFI

management saying that NFI was not performing, with the worst performing shift being Plaintiff's shift.

**RESPONSE:** Denied. Plaintiff's shift performed relatively equal to or better than the other shifts. (Griffin depo., p. 15:10-23.) Mr. Cribbs was a competent manager. (Pero Decl., ¶ 16.) His performance was comparable to the performance of any other manager. *Id.* Most of the time, the shift supervised by Mr. Cribbs was the most productive of the four shifts at the Distribution Center, night after night setting records for production. (Revised Declaration of Jeremy Walker ("Walker Decl."), ¶ 5.)

34.    Plaintiff's shift was the lowest performing shift on the DC side in 2009 and 2010.

**RESPONSE:** Denied. Plaintiff's shift performed relatively equal to or better than the other shifts. (Griffin depo., p. 15:10-23.) Mr. Cribbs was a competent manager and his performance was comparable to the performance of any other manager. (Pero Decl., ¶ 16.) Most of the time, the shift supervised by Mr. Cribbs was the most productive of the four shifts at the Distribution Center, night after night setting records for production. (Walker Decl., ¶ 5.)

35.    Also in the first quarter of 2010, NFI management was looking into a large spike in productivity on Plaintiff's shift that did not make sense because Plaintiff's shift went from being the worst shift to the best shift in a matter of days.

**RESPONSE:** Denied, and irrelevant. Plaintiff's shift performed relatively equal to or better than the other shifts. (Griffin depo., p. 15:10-23; Pero Decl., ¶ 16.) Most of the time, the shift supervised by Mr. Cribbs was the most productive of the four shifts at the Distribution Center, night after night setting records for production. (Walker Decl., ¶ 5.) Moreover, when Plaintiff discovered that Walker had been manipulating the LMS system, he confronted him about it and demanded that he end the misconduct. (Plaintiff Decl., ¶ 5; Griffin depo., p. 11:7-14.) Mr. Cribbs had nothing to do with manipulating the LMS system and he had no knowledge that Jeremy Walker told other employees how to manipulate the system. (Walker Dec., ¶ 11; Plaintiff Decl., ¶ 5.) When Mr. Cribbs discovered that Mr. Walker was manipulating the LMS system, he told him to stop doing it. (*Id.*)

36. In February of 2010, Plaintiff failed to notify his manager about a power outage that occurred on his shift.

**RESPONSE:** Denied. The loads were behind before the power outage occurred and before Plaintiff even came to work, so the power outage was not the cause of the back-up in the loading of product. (Plaintiff Decl., ¶ 7.) Plaintiff fixed the power problem (working with Georgia Pacific (GP) technicians) before leaving at the end of his shift. (*Id.*) As such, there was no problem to report to Mr. Diego. (*Id.*) So, Mr. Cribbs did not fail to do anything he was required to do. (See *id.*)

37.     Even though the power outage on Plaintiff's shift caused a back-up in the loading of product, Plaintiff left at the end of his shift without informing his manager of the issue.

**RESPONSE:**  Denied. The loads were behind before the power outage occurred and before Plaintiff even came to work, so the power outage was not the cause of the back-up in the loading of product. (Plaintiff Decl., ¶ 7.)   Plaintiff fixed the power problem (working with Georgia Pacific (GP) technicians before leaving at the end of his shift.  (*Id*.)  There was no problem to report to Mr. Diego. (*Id*.) Moreover, Plaintiff did not leave his shift early this night for comp time or any other reason.  (*Id*.)

38.     Tom Diego, the Plant Manager at the time, contacted Plaintiff at his home the morning after the power outage and spoke to him about this work-related incident.

**RESPONSE**:  Admitted.

39.     Mr. Diego was upset with Plaintiff because NFI was behind on "load-by" times because of a power outage during Plaintiff's shift, and Mr. Diego believed Plaintiff should have called him about the power outage, but Plaintiff had not, and Plaintiff had gone home at the end of his shift with work still pending.

**RESPONSE:**  Denied.  Plaintiff objects to this alleged statement of fact.  If Mr. Diego was "upset" and what Mr. Diego "believed" are hearsay testimony from

witnesses other than Mr. Diego. Apparently, Mr. Diego is unwilling to testify for

Defendant. Subject to the objection, Plaintiff states that the loads were behind

before the power outage occurred and before he even came to work, so the power

outage was not the cause of the back-up in the loading of product. Plaintiff fixed

the power problem (working with Georgia Pacific technicians before leaving at the

end of his shift. There was no problem to report to Mr. Diego. (Plaintiff Decl., ¶

7.) To be clear, Plaintiff did not leave his shift early this night for comp time or

any other reason. (*Id*.) Plaintiff attempted to contact Mr. Diego to inform him

about the power outage, but Mr. Diego failed to answer his phone. (*Id*.) Plaintiff

worked on the power problem with the GP Technician from the Mill and fixed all

the problems. (*Id.*)

40.     At the end of that conversation, Plaintiff's wife came on the telephone

and stated that Plaintiff needed to go to the hospital.

**RESPONSE:** Denied. Plaintiff's wife did not speak to Mr. Diego. ( Revised

Declaration of Debra Cribbs ("Debra Cribbs Decl."), ¶¶ 4-6). Rather, she advised

Ms. Gould that Plaintiff needed to go to the hospital. (Plaintiff's depo., p. 25:11-

24; Debra Cribbs Decl., at ¶ 6.)

41.     Plaintiff contacted Ms. Gould by telephone after his telephone

conversation with Mr. Diego concluded and complained to Ms. Gould that Mr.

Diego "cursed" him and that the power outage was not Plaintiff's fault.

**RESPONSE:** Admitted.

42.     During that telephone conversation with Ms. Gould, Plaintiff did not complain to Ms. Gould that he had been treated differently because of his age or disability, and Plaintiff did not say anything about his age, having a disability, needing any kind of accommodation, or needing FMLA leave.

**RESPONSE:** Admitted, but irrelevant. While Plaintiff was on FMLA leave, he advised Ms. Gould on the telephone that he felt he was being treated unfairly by Mr. Diego and upper management due to his age and health issues.  (Plaintiff Decl. ¶ 15.)  Ms. Gould did not document Plaintiff's complaint.  (Byrnes depo., pp. 21:16-18; 45-1:16.)

43.     Within the next few days, Plaintiff's wife informed Ms. Gould that Plaintiff had been admitted to the hospital and that Plaintiff needed to go on medical leave.

**RESPONSE:** Denied.  Plaintiff's wife, Debra Cribbs, notified Ms. Gould within hours of Plaintiff's admission to the hospital that he had been so admitted.  (Debra Cribbs Decl., ¶ 6.)

44.     Ms. Gould provided FMLA paperwork to Mrs. Cribbs which was returned to Ms. Gould, and NFI afforded FMLA leave to Plaintiff for the entire period prescribed by Plaintiff's treating physician.

**RESPONSE:** Admitted.

45.     While Plaintiff was on FMLA leave, Ms. Gould contacted him periodically to check in with him as Ms. Gould would do with any employee on FMLA leave as that was part of her job responsibilities.

**RESPONSE:** Denied**.** While he was out on FMLA leave, Ms. Gould and Patrick Byrnes, regional vice president at NFI, repeatedly telephoned and harassed him about his need to come to meetings that were being held.  (Plaintiff depo., p. 47:9-48:8, 49:8-51:14; Plaintiff Decl., ¶¶ 13-14.)  Plaintiff advised that he could not come to work until his doctors released him.  (Plaintiff Decl., ¶ 14.)   But Ms. Gould and Mr. Byrnes kept demanding that he come to the meetings anyway. (Plaintiff depo., p. 49:12-17; Plaintiff Decl., ¶¶ 13-14.)

46.     During those telephone conversations while Plaintiff was on FMLA leave, Ms. Gould never asked Plaintiff to perform any work from home, and she never told him that any manager at NFI was out to get him.

**RESPONSE:** Denied. Ms. Gould advised Plaintiff that the company wanted him "out."  (Plaintiff depo., p. 50:3-10; Plaintiff Decl. ¶ 16.)   Ms. Gould explained that the company was tired of paying his medical bills, and wanted to "get rid" of him. (Plaintiff depo., p. 51:4-14; Plaintiff Decl. ¶ 15.)   Other employees had heard statements coming from managers, leads and "from all over" to the same effect. (McKenzie depo., p. 40:4-20.)   Indeed, NFI management moved Mr. Cribbs to the

Mill location "because he had a heart attack" (McKenzie depo., p.37), and they wanted him to fail in this new position.  (McKenzie depo., p.43.)

47.     Plaintiff called Ms. Gould multiple times during his FMLA leave asking for information regarding his shift.

**RESPONSE:**  Denied.  While he was out on FMLA leave, Ms. Gould and Patrick Byrnes, regional vice president at NFI, repeatedly telephoned and harassed him about his need to come to meetings that were being held.  (Plaintiff depo., p. 47:9-48:8, 49:8-51:14; Plaintiff Decl. ¶¶ 13-14.)  Plaintiff advised that he could not come to work until his doctors released him.  (Plaintiff Decl., ¶ 14.)   But Ms. Gould and Mr. Byrnes kept demanding that he come to the meetings anyway. (Plaintiff depo., p. 49:12-17; Plaintiff Decl., ¶¶ 13-14.)

During one of these telephone calls, Plaintiff advised Ms. Gould that he felt he was being treated unfairly by Mr. Diego and upper management due to his age and health issues.  (Plaintiff Decl., ¶ 15.)  Ms. Gould did not document Plaintiff's complaint.  (Byrnes depo., pp. 21:16-18; 45-1:16.)
Rather, Ms. Gould advised Plaintiff that the company wanted him "out."  (Plaintiff depo., p. 50:3-10; Plaintiff Decl., ¶ 16.)   Ms. Gould explained that the company was tired of paying his medical bills, and wanted to "get rid" of him.  (Plaintiff depo., p. 51:4-14; Plaintiff Decl., ¶ 16.)   Other employees had heard statements coming from managers, leads and "from all over" to the same effect.  (McKenzie

depo., p. 40:4-20.)   Indeed, NFI management moved Mr. Cribbs to the Mill location "because he had a heart attack" (McKenzie depo., p.37), and they wanted him to fail in this new position.  (McKenzie depo., p.43.)

48.    During those conversations, Plaintiff never mentioned anything to Ms. Gould regarding discrimination against him by NFI for any reason, including age or disability.

**RESPONSE:** Denied. While he was out on FMLA leave, Ms. Gould and Patrick Byrnes, regional vice president at NFI, repeatedly telephoned and harassed him about his need to come to meetings that were being held.  (Plaintiff depo., p. 47:9-48:8, 49:8-51:14; Plaintiff Decl., ¶¶ 13-14.)  Plaintiff advised that he could not come to work until his doctors released him.  (Plaintiff Decl., ¶ 14.)   But Ms. Gould and Mr. Byrnes kept demanding that he come to the meetings anyway. (Plaintiff depo., p. 49:12-17; Plaintiff Decl., ¶¶ 13-14.)

During one of these telephone calls, Plaintiff advised Ms. Gould that he felt he was being treated unfairly by Mr. Diego and upper management due to his age and health issues.  (Plaintiff Decl., ¶ 15.)  Ms. Gould did not document Plaintiff's complaint.  (Byrnes depo., pp. 21:16-18; 45-1:16.)

Rather, Ms. Gould advised Plaintiff that the company wanted him "out." (Plaintiff depo., p. 50:3-10; Plaintiff Decl., ¶ 16.)   Ms. Gould explained that the company was tired of paying his medical bills, and wanted to "get rid" of him.

(Plaintiff depo., p. 51:4-14; Plaintiff Decl., ¶ 16.) Other employees had heard statements coming from managers, leads and "from all over" to the same effect. (McKenzie depo., p. 40:4-20.)

49. During Plaintiff's FMLA leave, several other Shift Supervisors covered temporarily for Plaintiff's shift, including Rhonda Butler.

**RESPONSE:** Denied. Rhonda Butler took over Plaintiff's job and shift six days after Plaintiff left under FMLA leave. (Butler Depo., p. 7:17-23.; Plaintiff's Decl., ¶ 14.)

50. When Ms. Butler started covering temporarily for Plaintiff's shift in February of 2010, many of the associates on that shift approached her with complaints about Plaintiff including that Plaintiff was not doing his job, that Plaintiff was allowing Jeremy Walker to run the shift and bully people, and that Plaintiff was aware that LMS tampering was going on.

**RESPONSE:** Denied. Rhonda Butler, who happily had been re-assigned to Plaintiff's shift while he was out on FMLA leave, and was looking to take Plaintiff's shift permanently, (Butler depo, pp.7:17-19, 8:15-9:10), emailed Mr. Byrnes and Ms. Gould to inform them that some employees on the shift had been complaining that morale was low. (*Id.,* p. 35:15-36:17; Exhibit NN - Butler e-mail.) Ms. Butler conceded that Plaintiff made safety a priority, however. (Exhibit NN - Butler e-mail.) Moreover, Mr. Byrnes knew that changing Plaintiff's shift

would take away the only time he (Plaintiff) had with his family – something he told Mr. Byrne more than several occasions prior to the change. (Plaintiff's Decl., ¶ 13.) Employees on his shift agreed that Plaintiff performed his job well, treated employees who reported to him and others at NFI fairly, and made safety a priority. (Plaintiff Decl., ¶ 3; Griffin depo., p. 15:10-23; Rector depo., p. 16:12-18; Starling depo., p. 21:20-22; Pero depo., p. 15:6-15.) When he learned that another employee (Jeremy Walker) was manipulating the computerized efficiency system at work, Plaintiff told that employee to stop. (Plaintiff Decl., ¶ 5; Griffin depo., p. 11:7-14.) Plaintiff was not aware that Mr. Walker told other employees how to manipulate the system. (Plaintiff Decl., ¶ 5; Walker Decl., ¶ 10-11.) When Jeremy Walker was moved off of Mr. Cribbs' shift and went to the weekend day shift, he never had to log on to the LMS system until he was ready to load his first unit. (Walker Dec., ¶ 9.) If a production employee was told to fill gas tanks, they were told to log off the LMS system. (*Id.,* ¶¶ 7, 9.) If employees had to label loads, they were told to log off the LMS system. (*Id.,* ¶ 8.) Mr. Cribbs' direct supervisor, Tom Diego, was responsible for making these decisions about logging onto the LMS system and it was clear to Mr. Walker that Mr. Diego was trying to keep the shift's percentage low by requiring employees on Mr. Cribbs' shift to log on the system earlier than these times, thereby decreasing the shift's productivity. (*Id.,* ¶ 6.) It was clear to Mr. Walker that Tom Diego was targeting Mr. Cribbs and

trying to reduce the percentages and productivity of Mr. Cribbs' and Mr. Walker's shift. (*Id.*, ¶ 6.) At one time, employees were cheating on the LMS system for the purpose of getting their percentages higher. (*Id.*, ¶ 11.) Mr. Cribbs had nothing to do with this and he had no knowledge that Jeremy Walker told other employees how to do this. (*Id.*; Plaintiff Decl., ¶ 5.)

51.   Ms. Butler wrote an e-mail on February 11, 2010 summarizing those complaints. All the complaints about Plaintiff led Pat Byrnes coming down to interview people on Plaintiff's shift.

**RESPONSE:** Denied. NFI seized on Ms. Butler's email as an opportunity to get rid of the sick, old guy. In this regard, Mr. Byrnes purportedly interviewed the employees who allegedly had complained to Ms. Butler. (Byrnes depo., pp. 23:24-24:2.) This is so, even though Plaintiff's prior complaint to Ms. Gould about being unfairly treated was not investigated by the company. (*Id.*, p. 21:16-18.) Mr. Byrnes then instructed Reggie Pero, Plaintiff's direct report, to find ways to "write up" Plaintiff, which he did. (Pero depo., p. 24:12-15.) Mr. Pero could have written up other shift supervisors and managers for the same "violations" as Plaintiff, but did not "[b]ecause I was told specifically by Patrick Byrnes to make a concentrated effort to write up Randell [Plaintiff] at every cost to get him out of there" and to "make sure I am detailed in my documentation." (*Id.*, p. 24:7-15.)

Mr. Byrnes did not ask Mr. Pero to be extremely thorough and detailed in documentation of any other individual. (*Id.*, p. 27:11-14; see also Pero Decl.)

52.    While Plaintiff was on FMLA leave, Ms. Gould stayed late to interact with associates on Plaintiff's shift, and several associates from Plaintiff's shift came into her office to complain about Plaintiff, which complaints included that Plaintiff let Jeremy Walker run the shift, that Jeremy Walker bullied the associates, and that Plaintiff sat in his office and did not do anything.

**RESPONSE:** Denied, and irrelevant. While the paragraphs that NFI cites in Gould's affidavit may show that she received a complaint, they do not (and cannot) establish the truth of the underlying complaint.[4]  Employees on his shift agreed that Plaintiff performed his job well, treated employees who reported to him and others at NFI fairly, and made safety a priority. (Plaintiff Decl. ¶ 3; Griffin depo., p. 15:10-23; Rector depo., p. 16:12-18; Starling depo., p. 21:20-22; Pero depo., p. 15:6-15.)  When he learned that another employee (Jeremy Walker) was manipulating the computerized efficiency system at work, Plaintiff told that employee to stop. (Plaintiff Decl., ¶ 5; Griffin depo., p. 11:7-14.)  Mr. Cribbs had nothing to do with manipulating the LMS system and he had no knowledge that Jeremy Walker told other employees how to do this. (Plaintiff Decl., ¶ 5; Walker Dec., ¶ 11.)

---

[4] Importantly, Ms. Gould fails to provide the name of any employee who allegedly came to complain to her.

NFI, nevertheless, wanted to get rid of the sick, old guy.  In this regard, Mr. Byrnes purportedly interviewed the employees who allegedly had complained to Ms. Butler.  (Byrnes depo., pp. 23:24-24:2.)  This is so, even though Plaintiff's prior complaint to Ms. Gould about being unfairly treated was not investigated by the company.  (Byrnes depo., p. 21:16-18.)  Mr. Byrnes then instructed Reggie Pero, Plaintiff's direct report, to find ways to "write up" Plaintiff, which he did. (Pero depo., p. 24:12-15.)  Mr. Pero could have written up other shift supervisors and managers for the same "violations" as Plaintiff, but did not "[b]ecause I was told specifically by Patrick  Byrnes to make a concentrated effort to write up Randell [Plaintiff] at every cost to get him out of there" and to "make sure I am detailed in my documentation." (*Id.*, p. 24:7-15.)  Mr. Byrnes did not ask Mr. Pero to be extremely thorough and detailed in documentation of any other individual. (*Id.*, p. 27:11-14.)

53.     Mr. Byrnes was made aware of the complaints received by Ms. Gould and Ms. Butler, and he was also aware of efficiency issues, customer concerns, and a large, unexplained spike in productivity on Plaintiff's shift.

**RESPONSE:** Denied. To the extent that Defendants rely on paragraph 47 of Ms. Gould's affidavit to establish the stated facts, that affidavit does not support these facts.  Mr. Byrnes seized on Ms. Butler's email as a way to get rid of Plaintiff.  In this regard, Mr. Byrnes purportedly interviewed the employees who allegedly had

complained to Ms. Butler. (Byrnes depo., pp. 23:24-24:2.) This is so, even though Plaintiff's prior complaint to Ms. Gould about being unfairly treated was not investigated by the company. (*Id.*, p. 21:16-18.) Mr. Byrnes then instructed Reggie Pero, Plaintiff's direct report, to find ways to "write up" Plaintiff, which he did. (Pero depo., p. 24:12-15.) Mr. Pero could have written up other shift supervisors and managers for the same "violations" as Plaintiff, but did not "[b]ecause I was told specifically by Patrick Byrnes to make a concentrated effort to write up Randell [Plaintiff] at every cost to get him out of there" and to "make sure I am detailed in my documentation." (*Id.*, p. 24:7-15.) Mr. Byrnes did not ask Mr. Pero to be extremely thorough and detailed in documentation of any other individual. (*Id.*, p. 27:11-14.)

54.    Pat Byrnes traveled to the DC facility sometime during Plaintiff's FMLA leave in February and March of 2010 to investigate the multiple complaints about Plaintiff, as well as to look into concerns about efficiency issues on Plaintiff's shift.

**RESPONSE:** Admitted, but irrelevant. Mr. Byrnes seized on Ms. Butler's email as a way to get rid of Plaintiff. In this regard, Mr. Byrnes purportedly interviewed the employees who allegedly had complained to Ms. Butler. (Byrnes depo., pp. 23:24-24:2.) This is so, even though Plaintiff's prior complaint to Ms. Gould about being unfairly treated was not investigated by the company. (*Id.*, p. 21:16-18.) Mr.

Byrnes then instructed Reggie Pero, Plaintiff's direct report, to find ways to "write up" Plaintiff, which he did. (Pero depo., p. 24:12-15.) Mr. Pero could have written up other shift supervisors and managers for the same "violations" as Plaintiff, but did not "[b]ecause I was told specifically by Patrick Byrnes to make a concentrated effort to write up Randell [Plaintiff] at every cost to get him out of there" and to "make sure I am detailed in my documentation." (*Id.*, p. 24:7-15.) Mr. Byrnes did not ask Mr. Pero to be extremely thorough and detailed in documentation of any other individual. (*Id.*, p. 27:11-14.)

55.    Mr. Byrnes interviewed multiple employees on Plaintiff's shift and confirmed the complaints that: Plaintiff had put the contract with GP at risk; morale on Plaintiff's shift was very low; Plaintiff had lost trust and credibility on his shift; Plaintiff was inconsistent in his decisions, being temperamental in his moods, and showing favoritism to Jeremy Walker who served as the lead on his shift; Plaintiff was rarely out on the floor of the DC overseeing the work; Plaintiff would often be absent from his office and the facility during his shift for hours at a time; Plaintiff instructed for problems on the shift to be given to Jeremy Walker to handle; Plaintiff allowed Jeremy Walker to bully other associates and break rules with no consequences; Plaintiff instructed his crew to get the LMS numbers up and Plaintiff did not care how they did it.

**RESPONSE:** Denied. Mr. Byrnes seized on Ms. Butler's email as a way get to rid of Plaintiff. In this regard, Mr. Byrnes purportedly interviewed the employees who allegedly had complained to Ms. Butler. (Byrnes depo., pp. 23:24-24:2.) This is so, even though Plaintiff's prior complaint to Ms. Gould about being unfairly treated was not investigated by the company. (*Id.*, p. 21:16-18.) Mr. Byrnes then instructed Reggie Pero, Plaintiff's direct supervisor, to find ways to "write up" Plaintiff, which he did. (Pero depo., p. 24:12-15.) Mr. Pero could have written up other shift supervisors and managers for the same "violations" as Plaintiff, but did not "[b]ecause I was told specifically by Patrick Byrnes to make a concentrated effort to write up Randell [Plaintiff] at every cost to get him out of there" and to "make sure I am detailed in my documentation." (*Id.*, p. 24:7-15.) Mr. Byrnes did not ask Mr. Pero to be extremely thorough and detailed in documentation of any other individual. (*Id.*, p. 27:11-14.)

Plaintiff, moreover, performed his job well, treated employees who reported to him and others at NFI fairly, and made safety a priority. (Plaintiff Dec., ¶ 3; Griffin depo., p. 15:10-23; Rector depo., p. 16:12-18; Starling depo., p. 21:20-22; Pero depo., p. 15:6-15.) When he learned that another employee (Jeremy Walker) was manipulating the computerized efficiency system at work, Plaintiff told that employee to stop. (Plaintiff Decl., ¶ 5; Griffin depo., p. 11:7-14.) Plaintiff acted in an ethical, honest, professional and courteous fashion, and performed his job

functions in an efficient and professional manner, never missing an annual raise or quarterly bonus. (Plaintiff decl*.,* ¶¶ 3, 4; Byrnes depo., pp. 76:23-25 – 77:1-3.; Griffin depo., p. 15:10-23; Rector depo., p. 16:12-18; Starling depo., p. 21:20-22; Pero depo., p. 15:6-15.)

56. Pat Byrnes confirmed from multiple employees that associates on Plaintiff's shift had been cheating the LMS efficiency tracking system with Plaintiff's knowledge.

**RESPONSE:** Denied. When he learned that another employee (Jeremy Walker) was manipulating the computerized efficiency system at work, Plaintiff told that employee to stop. (Plaintiff Decl., ¶ 5; Griffin depo., p. 11:7-14.) Mr. Cribbs had nothing to do with manipulating the LMS system and was unaware that Mr. Walker had instructed other employees how to manipulate the system. (Plaintiff Decl., ¶ 5; Walker Decl., ¶ 11.) Plaintiff acted in an ethical, honest, professional and courteous fashion, and performed his job functions in an efficient and professional manner, never missing an annual raise or quarterly bonus. (Plaintiff Decl*.,* ¶¶ 3, 4; Byrnes depo., pp. 76:23-25 – 77:1-3.; Griffin depo., p. 15:10-23; Rector depo., p. 16:12-18; Starling depo., p. 21:20-22; Pero depo., p. 15:6-15.)

57. Jeremy Walker was demoted and other associates were disciplined as a result of this LMS cheating and other issues discovered during Mr. Byrne's investigation.

**RESPONSE:** Admitted, but irrelevant. When he learned that another employee (Jeremy Walker) was manipulating the computerized efficiency system at work, Plaintiff told that employee to stop. (Plaintiff Decl., ¶ 5; Griffin depo., p. 11:7-14.) Mr. Cribbs had nothing to do with manipulating the LMS system and he had no knowledge that Jeremy Walker told other employees how to do this. (Plaintiff Decl., ¶ 5; Walker Dec., ¶ 11.) Plaintiff acted in an ethical, honest, professional and courteous fashion, and performed his job functions in an efficient and professional manner, never missing an annual raise or quarterly bonus. (Plaintiff decl. ¶¶ 3, 4; Byrnes depo., pp. 76:23-25 – 77:1-3.; Griffin depo., p. 15:10-23; Rector depo., p. 16:12-18; Starling depo., p. 21:20-22; Pero depo., p. 15:6-15.)

58.    As a result of his investigation, Mr. Byrnes also determined that Plaintiff should be disciplined for the LMS cheating on his shift, and for Plaintiff's failure to perform his supervisory job responsibilities.

**RESPONSE:** Admitted, but irrelevant. Mr. Byrnes was looking to get rid of Plaintiff. (Pero depo., p. 24:12-15.) Mr. Byrnes instructed Reggie Pero, Plaintiff's direct report, to find ways to "write up" Plaintiff, which he did. (Pero depo., p. 24:12-15.) Mr. Pero could have written up other shift supervisors and managers for the same "violations" as Plaintiff, but did not "[b]ecause I was told specifically by Patrick Byrnes to make a concentrated effort to write up Randell [Plaintiff] at every cost to get him out of there" and to "make sure I am detailed in my

documentation." (*Id.*, p. 24:7-15.)  Mr. Byrnes did not ask Mr. Pero to be extremely thorough and detailed in documentation of any other individual.  (*Id.*, p. 27:11-14.)

Jeremy Walker, not Plaintiff, cheated the LMS system. (Plaintiff Decl., ¶ 5; Griffin depo., p. 11:7-14.)  When Plaintiff discovered that Walker was manipulating the computerized efficiency system at work, Plaintiff told him to stop.  (Plaintiff Decl., ¶ 5; Griffin depo., p. 11:7-14.)  Plaintiff had nothing to do with manipulating the LMS system and he had no knowledge that Jeremy Walker told other employees how to do this.  (Plaintiff Decl., ¶ 5; Walker Dec., ¶ 11.)  Indeed, the LMS system did not work and other employees and supervisors were cheating the system.  (Butler depo., pp. 20:24-22:16.)  Plaintiff acted in an ethical, honest, professional and courteous fashion, and performed his job functions in an efficient and professional manner, never missing an annual raise or quarterly bonus.  (Plaintiff decl*.*, ¶¶ 3, 4; Byrnes depo., pp. 76:23-25 – 77:1-3.; Griffin depo., p. 15:10-23; Rector depo., p. 16:12-18; Starling depo., p. 21:20-22; Pero depo., p. 15:6-15.)

59.   After considering Plaintiff's long tenure with the company and consulting with NFI's legal counsel and Ms. Gould, Mr. Byrnes decided that Plaintiff would be moved to an equivalent position at the NFI Mill facility just down the street so that he could get a fresh start with a new crew.

**RESPONSE:** Denied. Mr. Byrnes was looking to get rid of Plaintiff. (Pero depo., pp. 24:7-15, 27:11-14; Plaintiff depo., pp. 50:3-10, 51:4-14; Plaintiff Decl., ¶ 17; McKenzie depo., p. 40:4-20.) NFI management moved Mr. Cribbs to the Mill location "because he had a heart attack" (McKenzie depo., p.37), and with the hopes that Plaintiff would fail in his new role, and that he would quit. (McKenzie depo., pp. 40:6-8, 43:10-12, 44:5-6.) Mr. Byrnes knew that during the weekend night shift at the mill, "[t]he paperwork was different. The loads were different. The buildings were different. A lot of it's run by robots. Different safety issues at the mill, different confines of the mill. Everything was different than what we did on our side of the road." (Plaintiff depo., pp. 60:20-25 - 61:1-3.)

The new shift changed Plaintiff's life for the worse. In addition to having to essentially train himself for the new role, the new position required Plaintiff to then work long night hours over the weekend instead of during the week. (*Id.*, at p. 76:7-15.) As Plaintiff testified:

> I was put on the weekend nights. It changed the way me and my wife's relationship was because we had at one time to where we could spend the weekends together because she worked during the days and I worked nights during the week. So it left no time for us. So it was very emotional, not just for myself but my wife and the kids. I have a grandchild that lives with us.

(*Id.* at p. 76:7-15.) No other managers or supervisors had been involuntarily reassigned like Plaintiff was, much less after returning from FMLA leave. (Rector depo., p. 17:19-23; Plaintiff depo, p. 64:15-19; Butler depo., p. 9:17-23.)

60.    Plaintiff was released to return to regular work by his treating physician with no restrictions on his ability to work, and his FMLA leave ended, as of March 9, 2010.

**RESPONSE:** Admitted.

61.    When Plaintiff returned to work on March 9, 2010, he was moved to the Shift Supervisor position at the Mill which had the same pay, same benefits, same supervisory capacity, same job responsibilities and an equivalent night-time shift to Plaintiff's Shift Supervisor position down the street at the DC.

**RESPONSE:** Denied.  The weekend night shift at the mill was vastly different. (Plaintiff depo., pp. 60:20-25 -61:1-3.) "The paperwork was different. The loads were different. The buildings were different. A lot of it's run by robots.  Different safety issues at the mill, different confines of the mill. Everything was different than what we did on our side of the road." (*Id.*)

The new shift changed Plaintiff's life for the worse.  In addition to having to essentially train himself for the new role, the new position required Plaintiff to then work long night hours over the weekend instead of during the week. (*Id.*, at p. 76:7-15.)  As Plaintiff testified:

> I was put on the weekend nights. It changed the way me and my
> wife's relationship was because we had at one time to where we could
> spend the weekends together because she worked during the days and
> I worked nights during the week. So it left no time for us. So it was
> very emotional, not just for myself but my wife and the kids. I have a
> grandchild that lives with us.

(*Id*. at p. 76:7-15.)

62.    The shift at the Mill to which Plaintiff was moved was the same night-time hours, but occurred on Friday, Saturday and Sunday instead of Monday through Thursday.

**RESPONSE:** Admitted, but irrelevant. The new shift was not equivalent insofar as it did not offer the same terms, conditions, and privileges of his prior shift. (Plaintiff depo., pp. 60:20-25 -61:1-3.)  Indeed, Plaintiff's entire lifestyle changed for the worse due to the new shift.  (*Id*. at p. 76:7-15.)

63.    The Mill facility has a few different rules than the DC involving reporting incidents to GP in addition to NFI, but the tracking systems were equivalent, and the logistics work being done was the same.

**RESPONSE:** Denied. The new shift at the Mill did not offer the same terms, conditions, and privileges as Plaintiff's prior shift.  (Plaintiff depo., pp. 60:20-25 - 61:1-3.) "The paperwork was different. The loads were different. The buildings were different. A lot of it's run by robots.  Different safety issues at the mill, different confines of the mill. Everything was different than what we did on our side of the road."  (*Id.*)  Indeed, Plaintiff's entire lifestyle changed for the worse due to the new shift.  (*Id*., at p. 76:7-15.)  Plaintiff testified:

> I was put on the weekend nights. It changed the way me and my
> wife's relationship was because we had at one time to where we could
> spend the weekends together because she worked during the days and

> I worked nights during the week. So it left no time for us. So it was very emotional, not just for myself but my wife and the kids. I have a grandchild that lives with us.

(*Id.*)

64.     The only real difference between his shift at the DC and the shift at the Mill was that the former was 48 hours and the latter was 36 hours, which was a benefit to Plaintiff since he worked 12 less hours at the same pay.

**RESPONSE:** Denied. The new shift at the Mill did not offer the same terms, conditions, and privileges as Plaintiff's prior shift.  (Plaintiff depo., pp. 60:20-25 - 61:1-3.) "The paperwork was different. The loads were different. The buildings were different. A lot of it's run by robots.  Different safety issues at the mill, different confines of the mill. Everything was different than what we did on our side of the road." (*Id.*) Indeed, Plaintiff's entire lifestyle changed for the worse due to the new shift.  (*Id.*, at p. 76:7-15.)  Plaintiff testified:

> I was put on the weekend nights. It changed the way me and my wife's relationship was because we had at one time to where we could spend the weekends together because she worked during the days and I worked nights during the week. So it left no time for us. So it was very emotional, not just for myself but my wife and the kids. I have a grandchild that lives with us.

(*Id.*)

65.     After Plaintiff was moved to the Mill in March of 2010, in the spring of 2010, Ms. Butler was permanently moved to the DC from the Mill to serve as Shift Supervisor over the shift that had previously been supervised by Plaintiff because,

after Ms. Butler had started covering Plaintiff's shift temporarily, associate morale improved, performance on the shift improved, and normalcy was restored to the shift.

**RESPONSE:** Denied. Mr. Byrnes was looking to get rid of Plaintiff. (Pero depo., pp. 24:7-15, 27:11-14; Plaintiff depo., pp. 50:3-10, 51:4-14; Plaintiff Decl., ¶¶ 15-16; McKenzie depo., p. 40:4-20.) As such, Mr. Byrnes transferred Plaintiff to a new shift at the Mill[5] with the hopes that he would fail in his new role, and that he would quit. (McKenzie depo., pp. 40:6-8, 43:10-12, 44:5-6.) Employees on Plaintiff's DC shift agreed that Plaintiff treated them fairly. (Plaintiff Decl., ¶ 3; Griffin depo., p. 15:10-23; Rector depo., p. 16:12-18; Starling depo., p. 21:20-22; Pero depo., p. 15:6-15.) Plaintiff's shift at the DC performed relatively equal to or better than the other shifts. (Griffin depo., p. 15:10-23.)

66. Reggie Pero was hired as the Operations Manager at the Mill as Plaintiff's supervisor in the summer of 2010 sometime after Plaintiff was moved to the Mill, and Mr. Pero had a new and different management style.

**RESPONSE:** Admitted, but irrelevant. Mr. Byrnes Mr. Pero to find ways to "write up" Plaintiff, which he did. (Pero depo., p. 24:12-15.) Mr. Pero could have written up other shift supervisors and managers for the same "violations" as

---

[5] Mr. Brynes knew that the schedule of the new shift to which he transferred Plaintiff would devastate him and his family, taking away his weekend time-off which was his only free time to spend with his family. (Plaintiff Decl., ¶ 13) .

Plaintiff, but did not "[b]ecause I was told specifically by Patrick Byrnes to make a concentrated effort to write up Randell [Plaintiff] at every cost to get him out of there" and to "make sure I am detailed in my documentation." (*Id.*, p. 24:7-15.) Mr. Byrnes did not ask Mr. Pero to be extremely thorough and detailed in documentation of any other individual. (*Id.*, p. 27:11-14.)

67.     Mr. Pero reviewed the performance of all of the Shift Supervisors after he arrived, ranking Plaintiff as the lowest performing Shift Supervisor at the Mill, and he placed Plaintiff on a 45-day improvement plan.

**RESPONSE:** Denied. Mr. Byrnes instructed Reggie Pero, Plaintiff's direct report, to find ways to "write up" Plaintiff, which he did. (Pero depo., p. 24:12-15.) Mr. Pero could have written up other shift supervisors and managers for the same "violations" as Plaintiff, but did not "[b]ecause I was told specifically by Patrick Byrnes to make a concentrated effort to write up Randell [Plaintiff] at every cost to get him out of there" and to "make sure I am detailed in my documentation." (*Id.*, p. 24:7-15.) Mr. Byrnes did not ask Mr. Pero to be extremely thorough and detailed in documentation of any other individual. (*Id.*, p. 27:11-14.) Moreover, "the purpose of this plan was to give it to Mr. Cribbs, but Mr. Pero was told that we could not give it to just one person, so we had to give it to all the managers," , not just Plaintiff. (Pero Decl., ¶ 11; Pero depo. p. 8:19-25.)

68.     Mr. Pero was told by NFI human resources and management that he could

not single out Plaintiff for a review, but needed to review all Shift Supervisors.

**RESPONSE:** Denied. Mr. Byrnes instructed Reggie Pero, Plaintiff's direct

supervisor, to find ways to "write up" Plaintiff, which he did.  (Pero depo., p.

24:12-15.)  Mr. Pero could have written up other shift supervisors and managers

for the same "violations" as Plaintiff, but did not "[b]ecause I was told specifically

by Patrick  Byrnes to make a concentrated effort to write up Randell [Plaintiff] at

every cost to get him out of there" and to "make sure I am detailed in my

documentation." (*Id.*, p. 24:7-15.)  Mr. Byrnes did not ask Mr. Pero to be

extremely thorough and detailed in documentation of any other individual.  (*Id.*, p.

27:11-14.)   Moreover, Mr. Pero placed all the Shift Supervisors on 45-day

improvement plans, not just Plaintiff. (Pero Decl., ¶ 11; Pero depo. p. 8:19-25.)

69.  When Mr. Pero starting working as manager of the Mill in the summer of

2010, he instituted a new policy that required Shift Supervisors to report any

correctable behavior by an associate to a member of management or human

resources, and to not take any disciplinary action or suspend anyone without prior

approval.

**RESPONSE:** Admitted, but irrelevant. Mr. Byrnes instructed Reggie Pero to find

ways to "write up" Plaintiff, which he did.  (Pero depo., p. 24:12-15.)  Mr. Pero

could have written up other shift supervisors and managers for the same

"violations" as Plaintiff, but did not "[b]ecause I was told specifically by Patrick Byrnes to make a concentrated effort to write up Randell [Plaintiff] at every cost to get him out of there" and to "make sure I am detailed in my documentation." (*Id.*, p. 24:7-15.) Mr. Byrnes did not ask Mr. Pero to be extremely thorough and detailed in documentation of any other individual. (*Id.*, p. 27:11-14.) Moreover, Mr. Pero placed all the Shift Supervisors on 45 day improvement plans, not just Plaintiff. (Pero Decl., ¶ 11; Pero depo. p. 8:19-25.)

70.     Mr. Pero communicated this policy via e-mail to all Shift Supervisors, including Plaintiff, and it was commonly known among NFI employees that NFI management requires a Shift Supervisor to call their manager, even in the middle of the night during a night shift, before sending home an employee for disciplinary reasons.

**RESPONSE:** Admitted, but irrelevant. Mr. Byrnes instructed Reggie Pero, Plaintiff's direct report, to find ways to "write up" Plaintiff, which he did. (Pero depo., p. 24:12-15.) Mr. Pero could have written up other shift supervisors and managers for the same "violations" as Plaintiff, but did not "[b]ecause I was told specifically by Patrick  Byrnes to make a concentrated effort to write up Randell [Plaintiff] at every cost to get him out of there" and to "make sure I am detailed in my documentation." (*Id.*, p. 24:7-15.) Mr. Byrnes did not ask Mr. Pero to be extremely thorough and detailed in documentation of any other individual. (*Id.*, p.

27:11-14.)  Moreover, Mr. Pero placed all the Shift Supervisors on 45 day improvement plans, not just Plaintiff. (Pero Decl., ¶ 11; Pero depo. p. 8:19-25.) Moreover, Plaintiff and Mr. Pero had met regarding this employee and Mr. Pero had given Plaintiff express permission to take action if this employee committed a violation during his shift.  (Pero Decl., ¶ 8; Pero depo. pp. 21:14-25, 22:1-4.) Furthermore, Shift Supervisor Terry Baker sent someone home without permission and was not disciplined.  (Pero depo. pp. 22:15-25, 23:1-21.)

71.    Contrary to Mr. Pero's instruction, Plaintiff dismissed an employee without prior approval in September of 2010.

**RESPONSE:** Denied.  Plaintiff and Mr. Pero had met regarding this employee and Mr. Pero had given Plaintiff express permission to take action if this employee committed a violation during his shift.  (Pero Decl., ¶ 8; Pero depo., pp. 21:14-25, 22:1-4.)  Furthermore, Shift Supervisor Terry Baker, who had not complained about age or disability or FMLA discrimination (Byrnes depo., p. 45), sent someone home without permission and was not disciplined.  (Pero depo. pp. 22:15-25, 23:1-21.)

72.    Mr. Pero and Ms. Gould issued disciplinary action to Plaintiff for dismissing an employee without proper approval, which disciplinary action was consistent with disciplinary actions given for similar infractions and performance history.

**RESPONSE:** Denied. Mr. Byrnes Mr. Pero to find ways to "write up" Plaintiff, which he did. (Pero depo., p. 24:12-15.) Mr. Pero could have written up other shift supervisors and managers for the same "violations" as Plaintiff, but did not "[b]ecause I was told specifically by Patrick Byrnes to make a concentrated effort to write up Randell [Plaintiff] at every cost to get him out of there" and to "make sure I am detailed in my documentation." (*Id.*, p. 24:7-15.) Mr. Byrnes did not ask Mr. Pero to be extremely thorough and detailed in documentation of any other individual. (*Id.*, p. 27:11-14.) Moreover, Mr. Pero placed all the Shift Supervisors on 45 day improvement plans, not just Plaintiff. (Pero Decl., ¶ 11; Pero depo. p. 8:19-25.) Moreover, Plaintiff and Mr. Pero had met regarding this employee and Mr. Pero had given Plaintiff express permission to take action if this employee committed a violation during his shift. (Pero Decl., ¶ 8; Pero depo. pp. 21:14-25, 22:1-4.) Furthermore, Shift Supervisor Terry Baker sent someone home without permission and was not disciplined. (Pero depo. pp. 22:15-25, 23:1-21.)

73. Because of Plaintiff's low performance and his poor work history, Mr. Pero and Ms. Gould starting spot-checking Plaintiff which is consistent with how Ms. Gould would monitor other employees with performance and/or attendance issues.

**RESPONSE:** Denied. But if NFI was "spot-checking" Plaintiff, NFI was doing so because it was looking to get rid of Plaintiff. (Pero depo., pp. 24:7-15, 27:11-14; Plaintiff depo., pp. 50:3-10, 51:4-14; Plaintiff Decl., ¶¶ 15-16; McKenzie depo., p.

40:4-20.) Mr. Pero was told to specifically write up Plaintiff and focus on Plaintiff to "get Randell out of here." (Pero Decl., ¶ 7; Pero depo. pp. 10:20-23, 24:5-15.) Mr. Pero could have written up other shift supervisors and managers for the same "violations" as Plaintiff, but did not "[b]ecause I was told specifically by Patrick Byrnes to make a concentrated effort to write up Randell [Plaintiff] at every cost to get him out of there" and to "make sure I am detailed in my documentation." (*Id.*, p. 24:7-15.) Mr. Byrnes did not ask Mr. Pero to be extremely thorough and detailed in documentation of any other individual. (*Id.*, p. 27:11-14.)

74.    In August of 2010, Mr. Pero checked in at the Mill facility in the early morning to find Plaintiff absent, having left his shift without approval.

**RESPONSE:** Admitted, but irrelevant. Shift supervisors routinely left the facility for personal and other reasons without approval. (Pero depo., pp. 24:7-15, 27:11-14; Butler depo., p. 29:16-21; Plaintiff Decl., ¶ 6.) The write-up by Mr. Pero for Mr. Cribbs taking comp time was unjustified. (Pero depo., pp. 24:7-15, 27:11-14; Pero Decl., ¶ 9.) Mr. Cribbs was also the only manager Mr. Pero ever knew to be written up for this. (*Id.*; see also Plaintiff Decl., ¶ 7.) During his tenure, Mr. Pero witnessed[6] Thomas Ruarks leaves every Sunday morning and Chris Williams leave

_____

[6] Plaintiff offers the same Pero Declaration in support if his opposition to Defendant's Motion for Summary Judgment but, pursuant to the Court's Order, has edited the specifics of this factual proposition for which it was previously offered.

early almost every morning without being written up or given any other discipline. (Pero Dec., ¶ 9.)

75.    When a Shift Supervisor such as Plaintiff was required to attend a meeting during a time that was not during his regularly scheduled shift, NFI management allowed the Shift Supervisor to take what was commonly referred to as "comp time" off from the regularly scheduled shift.

**RESPONSE:** Admitted.

76.    This "comp time" must be arranged between the manager and the Shift Supervisor who reported to that manager, and could not be taken in the Shift Supervisor's discretion.

**RESPONSE:** Denied.  Shift supervisors routinely used comp time and left the facility for personal and other reasons without being disciplined.  (Pero depo., pp. 24:7-15, 27:11-14; Butler depo., p. 29:16-21.)  The write-up by Mr. Pero for Mr. Cribbs taking comp time was unjustified.  Mr. Cribbs was also the only manager ever written up for this.  During his tenure, Mr. Perio witnessed[7] Thomas Ruarks leaves every Sunday morning and Chris Williams leave early almost every morning without being written up or given any other discipline.  (Pero Dec., ¶ 9.)

77.  Since Plaintiff did not get approval from any manager to take "comp time" or leave his shift in August of 2010, Mr. Pero and Ms. Gould issued disciplinary

---

[7] See footnote 5, above.

action on September 17, 2010 to Plaintiff for this leaving the shift without approval.

**RESPONSE:** Admitted, but irrelevant. Shift supervisors routinely used comp time and left the facility for personal and other reasons without being disciplined. (Pero depo., pp. 24:7-15, 27:11-14; Butler depo., p. 29:16-21.) Mr. Pero was told to specifically write up Plaintiff and focus on Plaintiff to "get Randell out of here." (Pero Decl. ¶ 7; Pero depo. pp. 10:20-23, 24:5-15.) Mr. Pero could have written up other shift supervisors and managers for the same "violations" as Plaintiff, but did not "[b]ecause I was told specifically by Patrick Byrnes to make a concentrated effort to write up Randell [Plaintiff] at every cost to get him out of there" and to "make sure I am detailed in my documentation." (*Id.*, p. 24:7-15.) Mr. Byrnes did not ask Mr. Pero to be extremely thorough and detailed in documentation of any other individual. (*Id.*, p. 27:11-14.) By way of further response, Plaintiff incorporates by reference his responses above as if fully restated here.

78. This disciplinary action was consistent with disciplinary actions given for similar infractions and performance history.

**RESPONSE:** Denied. Mr. Pero was told specifically to write up Plaintiff and focus on Plaintiff to "get Randell out of here." (Pero Decl., ¶ 7; Pero depo. pp. 10:20-23, 24:5-15.) Mr. Pero could have written up other shift supervisors and managers for the same "violations" as Plaintiff, but did not "[b]ecause I was told

specifically by Patrick Byrnes to make a concentrated effort to write up Randell [Plaintiff] at every cost to get him out of there" and to "make sure I am detailed in my documentation." (Pero Decl. ¶ 9; Pero depo. p. 24:7-15.) Mr. Byrnes did not ask Mr. Pero to be extremely thorough and detailed in documentation of any other individual. (*Id.*, p. 27:11-14.) The type of write-ups Mr. Pero was directed to give Mr. Cribbs wer not given to other managers. (Pero Decl., ¶ 6.)

79.    On one occasion, Ms. Gould came into work early in the morning during Plaintiff's shift and found the lead on Plaintiff's shift doing all of Plaintiff's work.

**RESPONSE:** Denied. NFI was looking for reasons to get rid of Plaintiff. (Pero depo., pp. 24:7-15, 27:11-14; Plaintiff depo., pp. 50:3-10, 51:4-14; Plaintiff Decl., ¶¶ 15-16; McKenzie depo., p. 40:4-20; see also Pero Decl.) Shift supervisors routinely left the facility for personal and other reasons without being disciplined. (Pero depo., pp. 24:7-15, 27:11-14; Butler depo., p. 29:16-21; Plaintiff Decl., ¶ 7.) Plaintiff acted in an ethical, honest, professional and courteous fashion, and performed his job functions in an efficient and professional manner, and never missed being given an annual raise or quarterly bonus. (Plaintiff Decl. ¶¶ 3, 4; Byrnes depo., pp. 76:23-25 – 77:1-3.; Griffin depo., p. 15:10-23; Rector depo., p. 16:12-18; Starling depo., p. 21:20-22; Pero depo., p. 15:6-15.)

80.    After Plaintiff moved to the Mill, both Ms. Gould and Mr. Pero received some complaints from associates at the Mill that the lead on Plaintiff's shift (Jerry

McKenzie) was performing Plaintiff's Shift Supervisor duties, just as Plaintiff had been doing with Jeremy Walker at the DC.

**RESPONSE:** Denied. NFI was looking for reasons to get rid of Plaintiff. (Pero depo., pp. 24:7-15, 27:11-14; Plaintiff depo., pp. 50:3-10, 51:4-14; Plaintiff Decl., ¶¶ 15-16; McKenzie depo., p. 40:4-20.; *see also* Pero Decl.) Shift supervisors routinely left the facility for personal and other reasons without being disciplined. (Pero depo., pp. 24:7-15, 27:11-14; Butler depo., p. 29:16-21) Plaintiff acted in an ethical, honest, professional and courteous fashion, and performed his job functions in an efficient and professional manner, and never missed being given an annual raise or quarterly bonus. (Plaintiff Decl*., ¶¶* 3, 4; Byrnes depo., pp. 76:23-25 – 77:1-3.; Griffin depo., p. 15:10-23; Rector depo., p. 16:12-18; Starling depo., p. 21:20-22; Pero depo., p. 15:6-15.)

81. In October of 2010, GP notified NFI that it was going to have customers in the Mill facility for a tour.

**RESPONSE:** Admitted, but irrelevant.

82. Contrary to instructions Plaintiff received from Mr. Pero, Plaintiff did not complete the tasks and warehouse "housekeeping" matters he was assigned in order to prepare the area for the tour and GP became very upset when they walked through the facility on the day of the tour.

**RESPONSE:** Denied. Mr. Pero was told to specifically write up Plaintiff and focus on Plaintiff to "get Randell out of here." (Pero Decl., ¶ 7; Pero depo. pp. 10:20-23, 24:5-15.) Mr. Pero could have written up other shift supervisors and managers for the same "violations" as Plaintiff, but did not "[b]ecause I was told specifically by Patrick Byrnes to make a concentrated effort to write up Randell [Plaintiff] at every cost to get him out of there" and to "make sure I am detailed in my documentation." (Pero Decl., ¶¶ 9, 7; Pero depo. p. 24:7-15.) Mr. Byrnes did not ask Mr. Pero to be extremely thorough and detailed in documentation of any other individual. (*Id.*, p. 27:11-14.) The write-up about tasks and warehouse "housekeeping" matters was not justified because Plaintiff ran into issues with the customer's systems that were beyond his control. (Pero Decl., ¶ 10.)

83.    Since Plaintiff continued to inadequately perform his job responsibilities Mr. Pero and Ms. Gould prepared a detailed disciplinary action including a suspension, which disciplinary action was consistent with disciplinary actions given for similar infractions and performance history.

**RESPONSE:** Denied. NFI was looking for reasons to get rid of Plaintiff. (Pero depo., pp. 24:7-15, 27:11-14; Plaintiff depo., pp. 50:3-10, 51:4-14; Plaintiff Decl., ¶ 17; McKenzie depo., p. 40:4-20.) Mr. Pero was told to specifically write up Plaintiff and focus on Plaintiff to "get Randell out of here." (Pero Decl., ¶ 7; Pero depo. pp. 10:20-23, 24:5-15.) Mr. Pero could have written up other shift

supervisors and managers for the same "violations" as Plaintiff, but did not

"[b]ecause I was told specifically by Patrick Byrnes to make a concentrated effort

to write up Randell [Plaintiff] at every cost to get him out of there" and to "make

sure I am detailed in my documentation." (Pero Decl., ¶ 9; Pero depo. p. 24:7-15.)

Mr. Byrnes did not ask Mr. Pero to be extremely thorough and detailed in

documentation of any other individual. (*Id.*, p. 27:11-14.) The write-up about

tasks and warehouse "housekeeping" matters was not justified because Plaintiff ran

into issues with the customer's systems that were beyond his control. (Pero Decl.,

¶ 10.)

84.    A meeting between Ms. Gould, Reggie Pero, and Plaintiff took place on or

about October 18, 2010 to discuss that disciplinary action.

**RESPONSE:** Denied. Plaintiff met with Ms. Gould and Mr. Pero to discuss his

unfair treatment by management, to advise that he needed additional leave time

due to his disability, and also to request that he be reassigned to his former shift.

(Plaintiff Decl., ¶ 18.)

85.  Plaintiff [sic] he received the disciplinary action at that meeting with Gould

and Pero.

    **RESPONSE:** Denied.  The cited deposition transcript pages do not support

this so-called factual assertion.  Rather, the pages cited reference an Exhibit that

purportedly was dated October 18, 2010, and Mr. Cribbs testified that "Reggie

went and changed the date. He scratched it out and wrote another date in the middle part of his conversation. You should have that." (Plaintiff depo., p. 74:2-6.)

86.     After Mr. Pero left that disciplinary meeting, Plaintiff pulled a small recording device out of his pocket and told Ms. Gould that he had taped the conversation. Ms. Gould was shocked and believed his secretly recording the conversation might be illegal.

**RESPONSE:** Denied. Plaintiff had told Ms. Gould that he was tape recording the meeting at the outset. (Plaintiff depo., p. 71:18-20). Plaintiff tape recorded the meeting because the company failed to document his previous complaints to Ms. Gould, and also to make sure (among other things) that the company did not invent, manipulate, or inaccurately report what he said during the meeting. (*Id.*; *see also* Byrnes depo., pp. 21:9-18, 23:19-23; Plaintiff Decl., ¶ 17.) In any event, Company policy did not prohibit tape recording the meeting, and doing so was not illegal. (Pero Decl., ¶ 14.) Indeed, NFI management informed Plaintiff that he could record conversations with employees and recorders were given out to supervisors. (Plaintiff depo., p. 72:4-10.)

87.     Mr. Pero did not know that Plaintiff was recording the conversation, was surprised about the secret recording when Ms. Gould told him, and used the words "breach of trust" when describing the incident.

**RESPONSE:** Admitted, but irrelevant. Company policy did not prohibit tape recording the meeting, and doing so was not illegal. Indeed, NFI management informed Plaintiff that he could record conversations with employees and recorders were given out to supervisors. (Plaintiff depo., p. 72:4-10.)

88. Mr. Pero, in his position as a manager, had never had a conversation with a subordinate secretly recorded, and he asked Ms. Gould if it was legal for Plaintiff to do this.

**RESPONSE:** Admitted, but irrelevant.

89. Plaintiff alleges that he told Ms. Gould that he was recording the conversation before the meeting started on October 18, 2010, but he admitted that his supervisor, Reggie Pero, was not aware that Plaintiff was recording the conversation.

**RESPONSE:** Admitted.

90. Before this event of recording, Plaintiff had never recorded a conversation at NFI even though he claims that NFI management previously informed him that he could record conversations with employees and that recorders were given out to supervisors.

**RESPONSE:** Admitted, and NFI management did inform him that he could record conversations with employees and others, and recorders were given out to supervisors. (Plaintiff depo., p. 72:4-16.)

91.     Plaintiff admitted that the context that NFI management was talking about recording conversations was "any conversation that we would have with employees or otherwise not their own disciplinary meeting with management."

**RESPONSE:** Admitted.

92.     Plaintiff also admitted that NFI management later retrieved the recorders prior to the date Plaintiff recorded the conversation on October 13, 2010.

**RESPONSE:** Admitted, but irrelevant.  Company policy did not prohibit tape recording the meeting, and doing so was not illegal.  NFI management informed Plaintiff that he could record conversations with employees, and recorders were given out to supervisors.  (Plaintiff depo., p. 72:4-10.)

93.     During 2009 and 2010, NFI did not have a policy allowing for recording of conversations, and it is common sense to Ms. Gould that management would frown upon secret recordings of disciplinary meetings by a member of management.

**RESPONSE:** Denied.  Company policy did not prohibit tape recordings of the meeting, NFI management informed Plaintiff that he could record conversations with employees and others, and recorders were given out to supervisors.  (Plaintiff depo., p. 72:4-16.)

94.     It was common knowledge amongst NFI employees that NFI management would disapprove if they found out someone was secretly recording a conversation with NFI management, and that they would probably issue disciplinary action.

**RESPONSE:** Denied. Company policy did not prohibit tape recordings of the meeting, NFI management informed Plaintiff that he could record conversations with employees, and recorders were given out to supervisors. (Plaintiff depo., p. 72:4-10.)

95. NFI management believed that Plaintiff's secretly taping a disciplinary meeting with a supervisor constituted a breach of trust and a violation of the NFI Code of Conduct which prohibits, among other things, acts of insubordination, dishonesty and disrespect, and prohibits acts which reflect negatively on the company.

**RESPONSE:** Denied. NFI was looking for reasons to get rid of Plaintiff. (Pero depo., pp. 24:7-15, 27:11-14; Plaintiff depo., pp. 50:3-10, 51:4-14; Plaintiff Decl., ¶¶ 15-16; McKenzie depo., p. 40:4-20; *see also* Pero Decl.) The recording was not secret because Plaintiff had told Ms. Gould that he was tape recording the meeting at the outset. (Plaintiff depo., p. 71:18-20). Company policy did not prohibit tape recordings of the meeting, and doing so was not illegal. NFI management informed Plaintiff that he could record conversations with employees, and recorders were given out to supervisors. (Plaintiff depo., p. 72:4-10.)

96. Ms. Gould informed Pat Byrnes of Plaintiff's secretly recording the disciplinary meeting, and Mr. Byrnes conferred with NFI legal counsel to ensure

that Plaintiff's poor performance, repeated progressive discipline, and the breach of trust warranted termination from employment.

**RESPONSE:** Admitted, but irrelevant. Company policy did not prohibit tape recordings of the meeting, and doing so was not illegal. NFI management informed Plaintiff that he could record conversations with employees, and recorders were given out to supervisors. (Plaintiff depo., p. 72:4-10.)

97. One day after the October 18, 2010 disciplinary meeting in which Plaintiff secretly recorded the conversation, Plaintiff came to Ms. Gould's office and provided her with a doctor's note saying that he needed to be out of work the following weekend, and Ms. Gould told him that it was not a problem since he had received a suspension for that time period anyway.

**RESPONSE:** Denied. The recording was not secret because Plaintiff had told Ms. Gould that he was tape recording the meeting at the outset. (Plaintiff depo., p. 71:18-20). Plaintiff met with Ms. Gould to discuss his unfair treatment by management, to advise that he needed additional leave time due to his disability, and also to request that he be reassigned to his former shift. (Plaintiff Decl., ¶ 17.) Plaintiff tape recorded the meeting because the company failed to document his previous complaints to Ms. Gould, and also to make sure (among other things) that the company did not invent, manipulate, or inaccurately report what he said during the meeting. (*Id.*; *see also* Byrnes depo., pp. 21:9-18, 23:19-23; Plaintiff Decl., ¶

17.) Company policy did not prohibit tape recordings of the meeting, NFI management informed Plaintiff that he could record conversations with employees, and recorders were given out to supervisors. (Plaintiff depo., p. 72:4-10.)

98. There was nothing in that paperwork that indicate that there was any restriction on Plaintiff's ability to return to work, that Plaintiff was disabled, that he needed to go on FMLA leave, or that he required an accommodation.

**RESPONSE:** Denied. Management was aware of Plaintiff's anxiety, and Plaintiff specifically informed Ms. Gould that he required additional FMLA leave and an accommodation. (Plaintiff Decl., ¶ 17; Byrnes depo., pp. 26:13-17, 28:7-10.)

99. Plaintiff never mentioned anything to Ms. Gould about having anxiety, and he never requested to be given counseling.

**RESPONSE:** Denied. Plaintiff met with Ms. Gould to discuss his unfair treatment by management, to advise that he needed additional leave time due to his disability, and also to request that he be reassigned to his former shift. (Plaintiff Decl., ¶ 17.)

100. After consulting with NFI legal counsel, Mr. Byrnes decided to terminate Plaintiff's employment for his continued failure to perform his job duties and continued violation of NFI policies and procedures.

**RESPONSE:** Denied. NFI was looking for reasons to get rid of Plaintiff. (Pero depo., pp. 24:7-15, 27:11-14; Plaintiff depo., pp. 50:3-10, 51:4-14; Plaintiff Decl.,

¶¶ 115-16; McKenzie depo., p. 40:4-20; see also Pero Decl.) Mr. Byrnes terminated Plaintiff's employment after finding out he tape recorded his meeting with Ms. Gould in which he advised her that he needed additional leave time due to his disability, complained of unfair treatment by management, and requested that he be reassigned to his former shift. (Byrnes depo., pp. 21:9-18, 23:19-23; Plaintiff Decl., ¶ 17.) Company policy did not prohibit tape recordings of the meeting, doing so was not illegal, and NFI management informed Plaintiff that he could record conversations with employees, and recorders were given out to supervisors. (Plaintiff depo., p. 72:4-10.)

101. Plaintiff claims NFI discriminated against him based on his age by subjecting Plaintiff to more stringent performance expectations and harsher treatment than similarly situated younger employees and by terminating him.

**RESPONSE:** Admitted.

102. Plaintiff claims NFI retaliated against Plaintiff by subjecting him to adverse employment actions after Plaintiff complained of age discrimination.

**RESPONSE:** Admitted.

103. Plaintiff claims he suffers from a disability and NFI discriminated against Plaintiff on the basis of his disability, and retaliated against Plaintiff when Plaintiff requested an accommodation.

**RESPONSE:** Admitted.

104.  Plaintiff claims that NFI interfered with and denied Plaintiff the exercise of his rights under the FMLA and failed to restore Plaintiff to an equivalent position upon return from FMLA leave.

**RESPONSE:** Admitted.

105.  Plaintiff claims NFI failed to provide Plaintiff with notice of COBRA coverage.

**RESPONSE:** Admitted.

106.  Plaintiff alleged in his Complaint that he requested accommodations for his "disability," but Plaintiff admitted in deposition that all he actually did was carry his "disability paperwork into the HR office to let them know [he] would not be able to work" and there is nothing in the doctor's note he provided that indicates he is disabled.

**RESPONSE:** Denied. Plaintiff has (and had) a record of impairment. Plaintiff suffered from anxiety sufficiently severe to require him to take psychotropic medication, and to land him in the hospital following a heated exchange with one of his managers. (Plaintiff's depo., pp. 28:19-24, 29:4-11, 30:2-8, 31:22-24, 32:15-21.)  His anxiety substantially limited his ability to breathe (he thought he was having a heart attack), and to work (from February 10 to March 9, 2010).  (Plaintiff Decl., ¶¶ 11-12; Exhibit OO – Doctor's March 3, 2010 note.)  And, NFI regarded him as disabled by stress. Specifically, Mr. Byrnes testified

during his deposition that that the new position into which Plaintiff was transferred would be easier (*i.e.,* less stressful) for him. (Byrnes depo., pp. 26:13-17, 28:7-10.)

107. The paperwork brought to the office by Plaintiff on October 19, 2010 was not entitled "disability paperwork" and does not even mention a "disability." The paperwork but [sic] simply consisted of a doctor's note saying that Plaintiff needed to be out of work the following weekend. One day after the October 18, 2010 disciplinary meeting in which Plaintiff secretly recorded the conversation, Plaintiff came to Ms. Gould's office and provided her with a doctor's note saying that he needed to be out of work the following weekend, and Ms. Gould told him that it was not a problem since he had received a suspension for that time period anyway.

**RESPONSE:** Denied. The paperwork speaks for itself, and supports that Plaintiff has (and had) a record of impairment. Indeed, Plaintiff suffered from anxiety sufficiently severe to require him to take psychotropic medication, and to land him in the hospital following a heated exchange with one of his managers. (Plaintiff's depo., pp. 28:19-24, 29:4-11, 30:2-8, 31:22-24, 32:15-21.) His anxiety substantially limited his ability to breathe (he thought he was having a heart attack), and to work (from February 10 to March 9, 2010). (Plaintiff Decl., ¶ 12; Doc. 27-13, Exhibit OO – Doctor's March 3, 2010 note.) And, NFI regarded him as disabled by stress. Specifically, Mr. Byrnes testified during his deposition that

that the new position into which Plaintiff was transferred would be easier (*i.e.,* less stressful) for him. (Byrnes depo., pp. 26:13-17, 28:7-10.) Plaintiff met with Ms. Gould in October 2010 to discuss to advise her that he had received unfair treatment by management, and that he needed additional leave time due to his disability, and also to request that he be reassigned to his former shift. (Plaintiff Decl., ¶ 17.) NFI did not accommodate him. (*Id.*) Rather, NFI terminated Plaintiff's employment on October 22, 2010. (Byrnes depo., pp. 21:9-18, 23:19-23; Plaintiff Decl., ¶ 18.)

108. Plaintiff admitted that he did not receive any diagnosis relating to the incident involving an employee's death in a forklift accident.

**RESPONSE:** Admitted, but irrelevant. Plaintiff has (and had) a record of impairment. Plaintiff suffered from anxiety sufficiently severe to require him to take psychotropic medication, and to land him in the hospital following a heated exchange with one of his managers. (Plaintiff's depo., pp. 28:19-24, 29:4-11, 30:2-8, 31:22-24, 32:15-21.) His anxiety substantially limited his ability to breathe (he thought he was having a heart attack), and to work (from February 10 to March 9, 2010). (Plaintiff Decl., ¶ 11; Exhibit OO – Doctor's March 3, 2010 note.) And, NFI regarded him as disabled by stress. Specifically, Mr. Byrnes testified during his deposition that that the new position into which Plaintiff was transferred would be easier (*i.e.,* less stressful) for him. (Byrnes depo., pp. 26:13-17, 28:7-10.)

109.  Plaintiff admitted that he did not ever consider himself to be disabled.

**RESPONSE:** Admitted, but irrelevant.  Plaintiff has (and had) a record of impairment.  Plaintiff suffered from anxiety sufficiently severe to require him to take psychotropic medication, and to land him in the hospital following a heated exchange with one of his managers. (Plaintiff's depo., pp. 28:19-24, 29:4-11, 30:2-8, 31:22-24, 32:15-21.)  His anxiety substantially limited his ability to breathe (he thought he was having a heart attack), and to work (from February 10 to March 9, 2010).  (Plaintiff Decl., ¶ 11; Exhibit OO - Doctor's March 3, 2010 note.)  And, NFI regarded him as disabled by stress. Specifically, Mr. Byrnes testified during his deposition that that the new position into which Plaintiff was transferred would be easier (*i.e.,* less stressful) for him.  (Byrnes depo., pp. 26:13-17, 28:7-10.)

110.   Plaintiff admitted that nobody at NFI ever told him he was disabled.

**RESPONSE:** Admitted, but irrelevant. Plaintiff has (and had) a record of impairment.  Plaintiff suffered from anxiety sufficiently severe to require him to take psychotropic medication, and to land him in the hospital following a heated exchange with one of his managers. (Plaintiff's depo., pp. 28:19-24, 29:4-11, 30:2-8, 31:22-24, 32:15-21.)  His anxiety substantially limited his ability to breathe (he thought he was having a heart attack), and to work (from February 10 to March 9, 2010).  (Plaintiff Decl., ¶ 11; Exhibit OO – Doctor's March 3, 2010 note.)  And, NFI regarded him as disabled by stress. Specifically, Mr. Byrnes testified during

his deposition that that the new position into which Plaintiff was transferred would be easier (*i.e.,* less stressful) for him.  (Byrnes depo., pp. 26:13-17, 28:7-10.)

111.   During the phone conversation between Plaintiff and Mr. Diego on February 10, 2010, Mr. Diego did not mention anything to Plaintiff about Plaintiff's age, about a disability, or about FMLA leave.

**RESPONSE:** Admitted, but irrelevant.  Mr. Diego had been seeking to "get rid" of Plaintiff because he was too old (age 52), and had had some health issues. (Plaintiff's Decl. ¶¶ 13, 15, 16; see also Pero Decl.) Plaintiff advised Ms. Gould that he felt he was being treated unfairly by Mr. Diego and upper management due to his age and health issues.  (Plaintiff Decl., ¶ 15.)

112.   Plaintiff never told Mr. Pero or Ms. Gould, or to Ms. Gould's knowledge any other manager of NFI, that he had a disability.

**RESPONSE:** Denied**.**  NFI was aware that Plaintiff has (and had) a record of impairment.  Plaintiff suffered from anxiety sufficiently severe to require him to take psychotropic medication, and to land him in the hospital following a heated exchange with one of his managers. (Plaintiff's depo., pp. 25:11-24, 28:19-24, 29:4-11, 30:2-8, 31:22-24, 32:15-21; Debra Cribbs Decl., at ¶ 6.).)  His anxiety substantially limited his ability to breathe (he thought he was having a heart attack), and to work (from February 10 to March 9, 2010).  (Plaintiff Decl., ¶ 11; Exhibit OO – Doctor's March 3, 2010 note.)  And, NFI regarded him as disabled

by stress. Specifically, Mr. Byrnes testified during his deposition that that the new position into which Plaintiff was transferred would be easier (*i.e.,* less stressful) for him. (Byrnes depo., pp. 26:13-17, 28:7-10.)

113. NFI management did not regard Plaintiff as being disabled.

**RESPONSE:** Denied. Mr. Byrnes testified during his deposition that that the new position into which Plaintiff was transferred would be easier (*i.e.,* less stressful) for him. (Byrnes depo., pp. 26:13-17, 28:7-10.)

114. Plaintiff testified that he is not mentally ill, and only goes to his regular treating physician for treatment where he is treated for anxiety.

**RESPONSE:** Admitted, but irrelevant. Plaintiff has (and had) a record of impairment. Plaintiff suffered from anxiety sufficiently severe to require him to take psychotropic medication, and to land him in the hospital following a heated exchange with one of his managers. (Plaintiff's depo., pp. 25:11-24, 28:19-24, 29:4-11, 30:2-8, 31:22-24, 32:15-21; Debra Cribbs Decl., at ¶ 6.).) His anxiety substantially limited his ability to breathe (he thought he was having a heart attack), and to work (from February 10 to March 9, 2010). (Plaintiff Decl., ¶ 11; Exhibit OO – Doctor's March 3, 2010 note.) And, NFI regarded him as disabled by stress. Specifically, Mr. Byrnes testified during his deposition that that the new position into which Plaintiff was transferred would be easier (*i.e.,* less stressful) for him. (Byrnes depo., pp. 26:13-17, 28:7-10.)

115.   Plaintiff admitted that he never actually requested any accommodations from NFI for any disability in 2010.

**RESPONSE:** Denied.  In October 2010, Plaintiff met with Ms. Gould to discuss to advise her that he needed additional leave time due to his disability, and also to request that he be reassigned to his former shift.  (Plaintiff Decl., ¶ 17.)

116.  NFI management testimony confirms that Plaintiff never asked for an accommodation to perform his job duties.

**RESPONSE:** Denied. In October 2010, Plaintiff met with Ms. Gould to discuss to advise her that he needed additional leave time due to his disability, and also to request that he be reassigned to his former shift.  (Plaintiff Decl., ¶ 17.)

117.   During deposition, Plaintiff pointed to the incident of the fatality on his shift (which was, in Plaintiff's words, possibly within five years of 2010) when he claims to have made a request to the previous HR manager for some psychiatric help relating to the event of an employee's death in a forklift accident.

**RESPONSE:** Admitted, but irrelevant.  Plaintiff suffered from anxiety sufficiently severe to require him to take psychotropic medication, and to land him in the hospital following a heated exchange with one of his managers. (Plaintiff's depo., pp. 25:11-24, 28:19-24, 29:4-11, 30:2-8, 31:22-24, 32:15-21; Debra Cribbs Decl., at ¶ 6.).)  His anxiety substantially limited his ability to breathe (he thought he was having a heart attack), and to work (from February 10 to March 9, 2010).  (Plaintiff

Decl., ¶ 11; Exhibit OO - Doctor's March 3, 2010 note.)  And, NFI regarded him as disabled by stress. Specifically, Mr. Byrnes testified during his deposition that that the new position into which Plaintiff was transferred would be easier (*i.e.,* less stressful) for him.  (Byrnes depo., pp. 26:13-17, 28:7-10.)

118.  In his EEOC charge, Plaintiff mentions that he made a "request for accommodation with his disability" to HR manager Janet Shelton in August of 2007.  Exh. A; Plaintiff's Depo. I, Exhibit 2, p. 2.  This August 2007 request is not mentioned in Plaintiff's Complaint.

**RESPONSE:** Admitted, but irrelevant and not supported by the record.  The August 2007 request is not at issue in this lawsuit.

119.   Plaintiff admitted that, other than requesting to see somebody for counseling, he never requested any other accommodation from NFI.

**RESPONSE:** Denied. In October 2010, Plaintiff met with Ms. Gould to discuss to advise her that he needed additional leave time due to his disability, and also to request that he be reassigned to his former shift.  (Plaintiff Decl., ¶ 17.)

120.   Plaintiff admitted that NFI set up a counseling session for him after the event of the employee's death.

**RESPONSE:** Admitted, but irrelevant.  NFI terminated Plaintiff the day after he requested additional FMLA time and an accommodation. (Plaintiff depo., p. 39:16-21.)

121.  Plaintiff also claims in deposition to have requested such psychiatric help on October 21, 1010, the day before he was terminated.

**RESPONSE:** Admitted.

122.  Plaintiff stated that he told Ms. Gould on October 21, 2010 that he "still needed to see somebody and asked if my insurance would cover it, if nothing else." However, this allegation is not included in Plaintiff's Complaint. Plaintiff admitted in deposition that his Complaint contains all of his allegations against NFI.

**RESPONSE:** Admitted, but irrelevant and nonsensical.  NFI terminated Plaintiff two days after he requested additional FMLA time and an accommodation. (Plaintiff depo., p. 39:16-21.)

123.  The decision to terminate Plaintiff's employment was based solely on job-related non-discriminatory criteria, and was not based on Plaintiff's age, perceived or actual disability, or FMLA leave.

**RESPONSE:** Denied.  NFI terminated Plaintiff's employment on October 22, 2010 after Plaintiff, four days earlier, had complained of unfair treatment by management, and had requested leave due to a disability and an accommodation (that he be returned to his shift at the DC).  (Plaintiff Decl., ¶ 17.)

124.  Mr. Byrnes, who is sixty (60) years old, never mentioned Plaintiff's age, perceived or actual disability, or FMLA leave in the process of deciding to terminate Plaintiff's employment.

**RESPONSE:** Admitted, but irrelevant. Mr. Byrnes was looking to get rid of Plaintiff due to his age and health issues. (Pero depo., pp. 24:7-15, 27:11-14; Plaintiff depo., pp. 50:3-10, 51:4-14; Plaintiff Decl., ¶¶ 15-16; McKenzie depo., p. 40:4-20.)

125. Ms. Gould never witnessed any manager of NFI treat Plaintiff differently from other Shift Supervisors for any reason, including age, disability or because he took FMLA leave.

**RESPONSE:** Denied, conclusory and self-serving. Ms. Gould advised Plaintiff that the company wanted him "out." (Plaintiff depo., p. 50:3-10; Plaintiff Decl., ¶¶ 15-16.) Ms. Gould explained that the company was tired of paying his medical bills, and wanted to "get rid" of him. (Plaintiff depo., p. 51:4-14; Plaintiff Decl., ¶¶ 15-16.) Other employees had heard statements coming from managers, leads and "from all over" to the same effect. (McKenzie depo., p. 40:4-20.)

126. No member of NFI management ever instructed Ms. Gould to single out Plaintiff.

**RESPONSE:** Denied. NFI was looking to get rid of Plaintiff due to his age and health issues. (Pero depo., pp. 24:7-15, 27:11-14; Plaintiff depo., pp. 50:3-10, 51:4-14; Plaintiff Decl., ¶¶ 15-16; McKenzie depo., p. 40:4-20.) Ms. Gould advised Plaintiff that the company wanted him "out." (Plaintiff depo., p. 50:3-10; Plaintiff Decl., ¶ 16; see also Pero Decl and Walker Decl.) Ms. Gould explained

that the company was tired of paying his medical bills, and wanted to "get rid" of him. (Plaintiff depo., p. 51:4-14; Plaintiff Decl., ¶ 16.) Other employees had heard statements coming from managers, leads and "from all over" to the same effect. (McKenzie depo., p. 40:4-20.)

127. Ms. Gould never treated Plaintiff differently than other employees for any reason, including age, disability or because he took FMLA leave.

**RESPONSE:** Denied and self-serving. NFI was looking to get rid of Plaintiff due to his age and health issues. (Pero depo., pp. 24:7-15, 27:11-14; Plaintiff depo., pp. 50:3-10, 51:4-14; Plaintiff Decl. ¶ 16; McKenzie depo., p. 40:4-20.) Ms. Gould advised Plaintiff that the company wanted him "out." (Plaintiff depo., p. 50:3-10; Plaintiff Decl., ¶ 16; see also Pero Decl. and Walker Decl.) Ms. Gould explained that the company was tired of paying his medical bills, and wanted to "get rid" of him. (Plaintiff depo., p. 51:4-14; Plaintiff Decl., ¶ 16.) Other employees had heard statements coming from managers, leads and "from all over" to the same effect. (McKenzie depo., p. 40:4-20.)

128. Multiple NFI employees, supervisors and managers testified they never heard NFI management say anything discriminatory against Plaintiff for age or disability, and/or they are not aware of any evidence that Plaintiff was treated differently because of age or disability.

**RESPONSE:** Admitted, but irrelevant. Other employees testified that NFI was looking to get rid of Plaintiff due to his age and health issues. (Plaintiff depo., pp. 50:3-10, 51:4-14; Plaintiff Decl., ¶ 16; McKenzie depo., p. 40:4-20.)

129. If management was scrutinizing Plaintiff's performance, it was because of past performance problems and complaints made by associates on Plaintiff's shift.

**RESPONSE:** Denied. NFI was looking to get rid of Plaintiff due to his age and health issues. (Pero depo., pp. 24:7-15, 27:11-14; Plaintiff depo., pp. 50:3-10, 51:4-14; Plaintiff Decl., ¶ 16; McKenzie depo., p. 40:4-20.) Mr. Byrnes instructed Reggie Pero, Plaintiff's direct report, to find ways to "write up" Plaintiff, which he did. (Pero depo., p. 24:12-15.) Mr. Pero could have written up other shift supervisors and managers for the same "violations" as Plaintiff, but did not "[b]ecause I was told specifically by Patrick Byrnes to make a concentrated effort to write up Randell [Plaintiff] at every cost to get him out of there" and to "make sure I am detailed in my documentation." (*Id.*, p. 24:7-15.) Mr. Byrnes did not ask Mr. Pero to be extremely thorough and detailed in documentation of any other individual. (*Id.*, p. 27:11-14.)

130. Plaintiff admitted that everything he would have to say about why NFI wanted him "out" would be speculation.

**RESPONSE:** Denied. Plaintiff testified that Ms. Gould stated that the company wanted him "out." (Plaintiff depo., p. 50:3-10; Plaintiff Decl., ¶ 16; Pero Decl., ¶

7.)   Ms. Gould further told him that the company was tired of paying his medical bills, and wanted to "get rid" of him.  (Plaintiff depo., p. 51:4-14; Plaintiff Decl., ¶ 16.)

131.   During his absence from work in February and March of 2010, Plaintiff applied for and was granted FMLA leave by NFI.

**RESPONSE:** Admitted.

132.   Plaintiff never told Ms. Gould, or to her knowledge any other manager of NFI that he needed any FMLA leave that he was not afforded.

**RESPONSE:**  Denied.  In October 2010, Plaintiff met with Ms. Gould to advise that he needed additional leave time due to his disability, and also to request that he be reassigned to his former shift.  (Plaintiff Decl., ¶ 17.)  Four days later, he was fired. (*Id.*)

133.   After being out on FMLA leave starting February 10, 2010, Plaintiff was released to return to regular work with no restrictions on March 9, 2010.

**RESPONSE:** Admitted.

134.   Plaintiff admitted that, when he was returned to work on March 9, 2010 he was placed at the Mill NFI facility across the road and down the street from the DC NFI facility where he previously worked, had the same job title, he had the same level of responsibility, was still in a supervisory capacity, and had the same pay and benefits.

**RESPONSE:** Denied. At the new shift at the Mill, "[t]he paperwork was different. The loads were different. The buildings were different. A lot of it's run by robots. Different safety issues at the mill, different confines of the mill. Everything was different than what we did on our side of the road." (Plaintiff depo., pp. 60:20-25 -61:1-3.)

The new shift changed Plaintiff's life for the worse. In addition to having to essentially train himself for the new role, the new position required Plaintiff to then work long night hours over the weekend instead of during the week. (*Id.*, at p. 76:7-15.) As Plaintiff testified:

> I was put on the weekend nights. It changed the way me and my wife's relationship was because we had at one time to where we could spend the weekends together because she worked during the days and I worked nights during the week. So it left no time for us. So it was very emotional, not just for myself but my wife and the kids. I have a grandchild that lives with us.

(*Id.*, at p. 76:7-15.) No other managers or supervisors had been involuntarily reassigned like Plaintiff was, much less after returning from FMLA leave. (Rector depo., p. 17:19-23; Plaintiff depo, p. 64:15-19; Butler depo., p. 9:17-23.)

135. The Shift Supervisor position at the DC and the Mill are equivalent, and other NFI associates would be happy to work at either facility as long as their pay was the same.

**RESPONSE:** Denied. At the new shift at the Mill, "[t]he paperwork was different. The loads were different. The buildings were different. A lot of it's run

by robots. Different safety issues at the mill, different confines of the mill. Everything was different than what we did on our side of the road." (Plaintiff depo., pp. 60:20-25 -61:1-3.)

The new shift changed Plaintiff's life for the worse. In addition to having to essentially train himself for the new role, the new position required Plaintiff to then work long night hours over the weekend instead of during the week. (*Id.*, at p. 76:7-15.) As Plaintiff testified:

> I was put on the weekend nights. It changed the way me and my wife's relationship was because we had at one time to where we could spend the weekends together because she worked during the days and I worked nights during the week. So it left no time for us. So it was very emotional, not just for myself but my wife and the kids. I have a grandchild that lives with us.

(*Id.*, at p. 76:7-15.) No other managers or supervisors had been involuntarily reassigned like Plaintiff was, much less after returning from FMLA leave. (Rector depo., p. 17:19-23; Plaintiff depo, p. 64:15-19; Butler depo., p. 9:17-23.) Ms. Butler was quite happy to be assigned to Plaintiff's old shift because it was more desirable than the shift at the Mill. (Butler depo., pp. 8:15-9:10.) Indeed, Ms. Butler actively was looking for an opportunity to get Plaintiff's shift when Plaintiff advised that he was going out on FMLA leave. (*Id.,* p. 8:15-23.)

136. Working at the Mill is easier than working at the DC in some ways because the automated laser guided vehicles perform much of the work moving product.

**RESPONSE:** Denied. At the new shift at the Mill, "[t]he paperwork was different. The loads were different. The buildings were different. A lot of it's run by robots. Different safety issues at the mill, different confines of the mill. Everything was different than what we did on our side of the road." (Plaintiff depo., pp. 60:20-25 – 61:1-3.)

The new shift changed Plaintiff's life for the worse. In addition to having to essentially train himself for the new role, the new position required Plaintiff to then work long night hours over the weekend instead of during the week. (*Id.* at p. 76:7-15.) As Plaintiff testified:

> I was put on the weekend nights. It changed the way me and my
> wife's relationship was because we had at one time to where we could
> spend the weekends together because she worked during the days and
> I worked nights during the week. So it left no time for us. So it was
> very emotional, not just for myself but my wife and the kids. I have a
> grandchild that lives with us.

(*Id.*, at p. 76:7-15.) No other managers or supervisors had been involuntarily reassigned like Plaintiff was, much less after returning from FMLA leave. (Rector depo., p. 17:19-23; Plaintiff depo, p. 64:15-19; Butler depo., p. 9:17-23.) Ms. Butler was quite happy to be assigned to Plaintiff's old shift because it was more desirable than the shift at the Mill. (Butler depo., pp. 8:15-9:10.) Indeed, Ms. Butler actively was looking for an opportunity to get Plaintiff's shift when Plaintiff advised that he was going out on FMLA leave. (*Id.,* p. 8:15-23.)

137. One NFI Shift Supervisor who has worked at both the DC and the Mill prefers working at the Mill over working at the DC because it is more laid back at the Mill in her opinion.

**RESPONSE:** Denied. Ms. Butler was quite happy to be assigned to Plaintiff's shift because it was more desirable than her current shift (weekend nights at the mill across the street), which she had long wanted to change. (Butler depo., pp. 8:15-9:10.) Indeed, Ms. Butler actively was looking for an opportunity to get Plaintiff's shift when Plaintiff advised that he was going out on FMLA leave. (*Id.,* p. 8:15-23.)

138. There have been other NFI employees, in addition to Plaintiff, who returned from FMLA leave and were moved to different shifts in equivalent positions.

**RESPONSE:** Denied. No other managers or supervisors had been involuntarily reassigned like Plaintiff was, much less after returning from FMLA leave. (Rector depo., p. 17:19-23; Plaintiff depo, p. 64:15-19; Butler depo., p. 9:17-23.) Furthermore, the position at the Mill was not equivalent. (Plaintiff depo., pp. 60:20-25-61:1-3, 76:7-15.)

139. With regard to Plaintiff's Complaint that NFI discriminated against Plaintiff and subjected him to more stringent performance expectations and harsher treatment than similarly situated younger employees when he was placed at the

Mill, the only facts Plaintiff has to support that allegation are 1) that he claims he was the only person pulled from a shift into an unfamiliar area and 2) that he believed he received different training than other employees at the Mill location; however, Plaintiff does not actually have any knowledge about what training other employees received.

**RESPONSE:** Denied. NFI discriminated against Plaintiff on the basis of age and disability. *See* above.

140. The training that Plaintiff received when he started working at the Mill was consistent with the training other Shift Supervisors at the Mill have received, which training consisted of learning the GP rules and reports and on the job training with the lead on the shift.

**RESPONSE:** Denied. In addition to having to essentially train himself for the new role, the new position required Plaintiff to then work long night hours over the weekend instead of during the week. (*Id.*, at p. 76:7-15.) Also, "[t]he paperwork was different. The loads were different. The buildings were different. A lot of it's run by robots. Different safety issues at the mill, different confines of the mill. Everything was different than what we did on our side of the road." (Plaintiff depo., pp. 60:20-25-61:1-3.)

141.   With the same training that Plaintiff received, another Shift Supervisor who was moved from the DC to the Mill was up to speed and on her own after a couple of shifts.

**RESPONSE:** Admitted, but irrelevant.  NFI was looking to get rid of Plaintiff, and discriminated against him on the basis of age and disability, unlawfully retaliated against him, and interfered with his FMLA rights.  *See* above.

142.  Nobody at NFI told Plaintiff he was moved to the Mill facility because he took FMLA leave.

**RESPONSE:** Admitted, but irrelevant.  NFI was looking to get rid of Plaintiff, and discriminated against him on the basis of age and disability, unlawfully retaliated against him, and interfered with his FMLA rights.  *See* above.

143.   Plaintiff never complained to Ms. Gould, or to Ms. Gould's knowledge any other manager of NFI, about discrimination based on age, disability, or because he took FMLA leave.

**RESPONSE:** Denied.  Plaintiff advised Ms. Gould that he felt he was being treated unfairly by Mr. Diego and upper management due to his age and health issues.  (Plaintiff Decl., ¶ 15.)  He later complained in October 2010 of the unfair discriminatory treatment by management. (*Id.,* at ¶ 17.)

144.   Plaintiff did not ever complain to NFI management that he had been moved to the Mill facility because of his age.

**RESPONSE:** Denied. Plaintiff advised Ms. Gould that he felt he was being treated unfairly by Mr. Diego and upper management due to his age and health issues. (Plaintiff Decl., ¶ 15.) He later complained in October 2010 of the unfair discriminatory treatment by management. (*Id.,* at ¶ 17.)

145. Plaintiff never complained to Ms. Gould, or to Ms. Gould's knowledge any member of NFI management, that he did not receive adequate training at the Mill.

**RESPONSE:** Denied. Plaintiff complained in October 2010 of the unfair discriminatory treatment by management. (Plaintiff Decl., ¶ 17.)

146. There is no evidence that Plaintiff ever asked for additional training at the Mill.

**RESPONSE:** Admitted, but irrelevant. In October 2010, Plaintiff advised that he needed additional leave time due to his disability, and also requested that he be reassigned to his former shift. (Plaintiff Decl., ¶ 17.)

147. Plaintiff admits that the allegation contained in his Complaint (para. 15) that he verbally complained to NFI Human Resources about age discrimination on February 10, 2010 is incorrect; Plaintiff admits that he did not make a complaint about potential age discrimination at that time, and the only thing he complained about at that time was Mr. Diego's method of communication with him.

**RESPONSE:** Admitted, but irrelevant. While he was on FMLA leave, Plaintiff

advised Ms. Gould that he felt he was being treated unfairly by Mr. Diego and upper management due to his age and health issues. (Plaintiff Decl., ¶ 15.)

148.   Plaintiff took no steps on his own to seek mental health counseling even though he was covered by health insurance through NFI while employed.

**RESPONSE:** Denied. Plaintiff was being psychiatrically treated through the use of Klonopin and visits to his doctor. (Plaintiff depo., p. 32:13-21; Debra Cribbs Decl, ¶ 6.)

149.   A COBRA notice was sent to Plaintiff on May 15, 2012 from Blue Cross Blue Shield of Georgia which provided for a coverage starting date retroactive of November 2, 2010.

**RESPONSE:**  Denied.  Plaintiff never received a notice of opportunity to obtain insurance coverage under COBRA from Defendant or from Blue Cross Blue Shield of Georgia until he was presented with such a notice at his deposition on July 25, 2012. (Plaintiff Decl., ¶¶  21, 22.) To elect such retroactive coverage, Plaintiff would have had to pay all back due premiums. (See COBRA notice – Exhibit PP.)  This Plaintiff could not afford to do because he was already paying premiums for his current group health insurance. (Plaintiff Decl., ¶ 23.)  This was especially so, given that the COBRA premiums were not subsidized by any contributions by NFI. (*Id.* at ¶ 24.)  That is, Plaintiff would have had to pay past premiums at 102% of the cost of such coverage. (*Id.*)

150. Plaintiff never submitted anything in writing to NFI or the insurance company requesting continuation of his insurance coverage.

**RESPONSE:** Admitted, but irrelevant. NFI failed and refuse to provide the requisite COBRA notice and election forms to Plaintiff timely after his termination, even though Plaintiff and his wife repeatedly requested such documentation. (Plaintiff depo., pp. 74:14-23, 75:1-4; Debra Cribbs Decl. ¶ 8.)

## II.     RESPONSE TO DEFENDANT'S CONCLUSIONS OF LAW.

A.      To the extent that the conclusion of law set forth in paragraph II.A. of Defendant's Statement of Uncontested Facts and Conclusions of Law Thereof requires any response, and Plaintiff contends it does not, Plaintiff denies the conclusion of law. Plaintiff has established that the facts are disputed and that summary judgment is not appropriate.

B.      Plaintiff objects to paragraph II.B. of Defendant's Statement of Uncontested Facts and Conclusions of Law Thereof because it is vague and uncertain of meaning, and cannot be admitted, denied or otherwise given an appropriate response.

1.      The direct and undisputed evidence demonstrates that the adverse employment actions suffered by Plaintiff did not result from his own conduct but from the intentional discriminatory conduct of Defendant.

2.    The direct and undisputed evidence demonstrates that the decision to terminate Plaintiff's employment was based on: age, perceived or actual disability, and Plaintiff's request for and exercise of FMLA leave.

C.    Plaintiff's age discrimination claim is supported by substantial evidence that must be tried to a jury.

1.    Plaintiff has demonstrated a prima facie case of age discrimination.

2.    Plaintiff has offered direct evidence of age discrimination.

3.    Defendant has failed to offer undisputed facts demonstrating, as a matter of law, any legitimate non-discriminatory reason for any adverse employment action.

4.    Plaintiff has demonstrated pretext on the part of NFI.

D.    Plaintiff's disability discrimination claim is supported by substantial evidence that must be tried to a jury.

1.    At all times relevant to this litigation, Plaintiff was disabled.

2.    Plaintiff requested an accommodation from Defendant.

3.    Plaintiff has demonstrated a causal connection between Plaintiff's disability and Defendant's discriminatory conduct.

E.    Plaintiff's ADA and ADEA retaliation claims are supported by substantial evidence that must be tried to a jury.

1.     Plaintiff engaged in statutorily protected conduct.

2.     Plaintiff has demonstrated a causal connection between Plaintiff's protected conduct and Defendant's retaliatory conduct.

3.     Plaintiff objects to paragraph II.E.3. of Defendant's conclusions of law because it has an indecipherable sentence structure and is, therefore, denied in its entirety.  Defendant has failed to establish as a matter of law that it had a legitimate nondiscriminatory reason for its retaliatory conduct and Plaintiff has offered substantial evidence of pretext.

F.     Plaintiff's FMLA claims are supported by substantial evidence that must be tried to a jury.

1.     Plaintiff has demonstrated adverse interference with his exercise of FMLA leave.

2.     Defendant adversely interfered with Plaintiff's exercise of FMLA leave by transferring him to a job with new and different terms and conditions of employment.

3.     Defendant had no legitimate, non-discriminatory reason for transferring Plaintiff.

4.     If Plaintiff needed to demonstrate economic harm at this stage of the litigation, which Plaintiff denies, Plaintiff has demonstrated economic

harm sufficient for the Court to deny Defendant's motion for summary judgment.

G.     Defendant is not entitled to summary judgment on Plaintiff COBRA claims.  Rather, Plaintiff is entitled to judgment on such claims as a matter of law.

RESPECTFULLY SUBMITTED this 18th day of November, 2013.


*/s/ Paul J. Sharman*
PAUL J. SHARMAN, ESQ.
Counsel for Plaintiff
Georgia State Bar No. 227207

THE SHARMAN LAW FIRM LLC
1175 Cicero Drive, Suite 100
Alpharetta, GA 30022
Phone: (678) 242-5297
Fax: (678) 242-5201
Email: paul@sharman-law.com

*/s/ S. Wesley Woolf*
S. WESLEY WOOLF
Counsel for Plaintiff
Georgia Bar No. 776175

S. WESLEY WOOLF, P.C.
408 East Bay Street
Savannah, Georgia  31401
T:  (912) 201-3696
F:  (912) 236-1884
woolf@woolflawfirm.net